Matthew **BROWELL**, Plaintiff,

v.

Paul **LEMAHIEU**, in his official capacity as Superintendent, State of Hawaii; Department of Education, State of Hawaii, Defendants.

No. Civ. 99–523 ACK–FIY.

United States District Court,
D. Hawaii.

March 7, 2000.

Matthew C. Bassett, The Protection and Advocacy, Agency of Hawaii, Honolulu, HI, for Plaintiff.

Steven K. Chang, Department of the Attorney General, Employment Law Division, Russell A. Suzuki, Department of the Attorney General, Education Division, Honolulu, HI, for Defendants.

### *ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND GRANTING DEFENDANTS' MOTION TO DISMISS IN PART*

KAY, District Judge.

Matthew Browell ("Plaintiff") filed a complaint July 21, 1999 against Paul LeMahieu, in his official capacity as the Superintendent for the State of Hawaii, and against the Department of Education (collectively, "Defendants"). Plaintiff's complaint is an appeal from an adverse decision of an administrative hearing officer rendered in a due process hearing under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1400 *et seq.,* and the Hawaii Administrative Rules for the Department of Education, Title 8, Chapter 36.

The Court will first explain the statutory framework of the IDEA to place the facts

of this case in context. Next, it will explain the standard of review in IDEA appeals. The Court will then lay out the facts of this case. Finally, the Court will evaluate the motions before it.

### STATUTORY FRAMEWORK

The IDEA provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures. *See* 20 U.S.C. § 1412; *see also Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1468 (9th Cir.1993). The IDEA guarantees all handicapped children a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1400(d)(1)(A) & 1412(a)(1)(A). According to the IDEA, a FAPE encompasses "special education and related services designed to meet [disabled students'] unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also* 20 U.S.C. § 1401(8). There is an affirmative obligation on schools to identify and evaluate students who are eligible for special education. 20 U.S.C. § 1412(a)(3). The special education needs of each child must be individually tailored to meet his or her unique needs by means of an Individualized Education Program ("IEP"). *See generally* 20 U.S.C. §§ 1401(11) & 1414(d). The IEP is developed with the participation of school officials, parents, and other persons knowledgeable about the child. *See* 20 U.S.C. § 1414(d)(1)(B); *see also* 34 C.F.R. § 300.344. One requirement of an IEP for students sixteen and above is that it contain a statement of needed "transition services, including, when appropriate, a statement of the interagency responsibilities or any needed linkages." *See* 20 U.S.C. § 1414(d)(1)(A)(vii)(II). "Transition services" are defined as "a coordinated set of activities" that "promotes movement from school to post-school activities," "is based upon the individual student's needs, taking into account the student's

preferences and interests," and which includes "instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation." *See* 20 U.S.C. § 1401(30).

If a parent disagrees with the contents of an IEP, that parent may challenge the contents thereof by demanding an administrative due process hearing. *See* 20 U.S.C. § 1415(f). At the conclusion of the administrative proceeding, any party dissatisfied with the administrative decision may seek judicial review in the federal or state courts. *See* 20 U.S.C. § 1415(i)(2)(A) & (3); 34 C.F.R. § 300.512. Additionally, if the parent of the disabled child is the prevailing party in a proceeding brought under § 1415, a court has discretion to award attorneys' fees and costs. *See* 20 U.S.C. § 1415(i)(3)(B). This action comes before this Court as such an appeal and as a request for attorneys fees.

### STANDARD OF REVIEW

"[A] court's inquiry in suits brought under [20 U.S.C. § 1415(i)(2)(A) ][1] is twofold. First, has the State complied with the procedures set forth in the [IDEA]? And second, is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Board of Educ. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *see also Seattle Sch. Dist., No. 1 v. B.S.,* 82 F.3d 1493, 1498–99 (9th Cir.1996). The Ninth Circuit has refined this test, stating that, "the correct standard for measuring educational benefit under the IDEA is not merely whether the placement is 'reasonably calculated to provide the child with educational benefits,' but rather, whether the child makes progress toward the goals set forth in her IEP." *County of San Diego v. California Special*

1. The Court substituted the proper section of the IDEA as now codified.

*Ed. Hearing Office,* 93 F.3d 1458, 1467 (9th Cir.1996). The IDEA statute expressly provides that in performing the above inquiry, courts "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *See* 20 U.S.C. § 1415(i)(2)(B). The amount of deference accorded to the hearing officer's findings increases where they·are "thorough and careful." *See Capistrano Unified Sch. Dist. v. Wartenberg,* 59 F.3d 884, 891 (9th Cir.1995). In rendering its decision, a court should keep in mind that the "free appropriate public education" to which a disabled child is entitled under the IDEA "does not mean the absolutely best or 'potential-maximizing' education." *Gregory K. v. Longview Sch. Dist.,* 811 F.2d 1307, 1314 (9th Cir.1987). Finally, the party challenging an administrative ruling has the burden of proof. *Seattle,* 82 F.3d at 1498.

In reviewing findings made during the administrative proceedings contemplated by the statute, the Ninth Circuit has adopted the following observation:

> The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole. Thus, as the district judge here recognized, federal courts cannot ignore the administrative findings. Ultimately, however, the weight to be accorded administrative findings under the IDEA is a matter within the discretion of the federal courts.

*Ash v. Lake Oswego Sch. Dist.,* 980 F.2d 585, 587–88 (9th Cir.1992) (citations omitted).

Finally, although a party in an IDEA appeal may request "summary judgment," the fact that a motion is so captioned does not mean that this Court uses its normal summary judgment standard of review in which it examines whether genuine issues of material fact exist. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the Ninth Circuit in *Wartenberg,* 59 F.3d at 891 explained:

> Our opinion in *Ojai* explores the difficulty of using a summary judgment framework for what amounts to resolution of conflicting evidence on the facts. In that case, as in many under the [IDEA], disputed issues of fact existed. Likewise, in the case at bar, the mixed question of the cause of [the student's] school failure was disputed. Ordinarily summary judgment could not issue, because of the genuine dispute.

The Court continued, explaining that a,

> puzzling procedural problem arises whenever the district court adjudicates administrative appeals, because the Federal Rules of Civil Procedure do not plainly speak to how such appeals should be handled. It is hard to see what else the district court could do as a practical matter under the statute except read the administrative record, consider the new evidence, and make an independent judgment based on a preponderance of evidence and giving due weight to the hearing officer's determinations. The district court's independent judgment is not controlled by the hearing officer's recommendations, but neither may it be made without due deference. Because this appears to be what Congress intended under the Act, we conclude that it is the right thing to do, even though it does not fit well into any pigeonhole of the Federal Rules of Civil Procedure. Though the parties may call the procedure a "motion for summary judgment"

in order to obtain a calendar date from the district court's case management clerk, the procedure is in substance an appeal from an administrative determination, not a summary judgment. *Wartenberg,* 59 F.3d at 892. The use of summary judgment is therefore acceptable in IDEA appeals, even if there are disputed issues of material fact, so long as parties have a chance to submit additional evidence, if desired. This could be done via a bench trial, if necessary. *See Seattle,* 82 F.3d at 1497. Usually, however, it is done by parties submitting affidavits and exhibits. *See, e.g., Wartenberg,* 59 F.3d at 889.

### BACKGROUND FACTS

Under the IDEA, the Court is to base its factual conclusions on the administrative record and, if submitted by the parties, additional evidence. *See* 20 U.S.C. § 1415(i)(2)(B). Defendant submitted exhibits on its motion to dismiss, or in the alternative, for summary judgment. Plaintiff did not present the Court with any additional evidence.[2] The Court also considered arguments made by counsel at the hearing held March 6, 2000 on the instant motion. The Court reaches the following factual conclusions after a careful review of the administrative record:[3]

At the time of the filing of this lawsuit, Plaintiff was an eighteen year old special education student, qualified for protection under the IDEA. He had been qualified for special education in Hawaii since 1995. Plaintiff suffers from a bi-polar disorder and is certified as "emotionally impaired."

In February of 1999, Plaintiff began a residential placement at a facility called Kapaola. He was to receive both educational services and treatment for his emotional impairments. This placement was done under Plaintiff's March 1998 IEP. There is no issue of the initial appropriateness of this placement. It is undisputed, however, that Plaintiff's teacher at Kapaola resigned very soon after Plaintiff began receiving educational services. *See* R. at 144, 222, 273. Plaintiff remained at Kapaola for two to three weeks after the special education teacher's departure.

The parties differ in their accounts of what transpired at Kapaola. Regarding the education Plaintiff was receiving there, Defendants maintain that Plaintiff continued to receive a FAPE at Kapaola after the teacher's departure because other staff members administered lesson plans. *See* R. at 223–24. Conversely, Plaintiff says that he stopped receiving a FAPE in late February and it did not resume again before he left the facility.[4] As for how Plaintiff left Kapaola, Defendant maintains that Plaintiff unilaterally withdrew himself from his placement there on March 12, 1999. *See* R. at 226–28, 273–74.[5] Plaintiff argues that he was "administratively dis-

---

2. The Court notes that in the March 6, 2000 hearing it asked both parties if they wished to submit additional evidence and both replied in the negative.

3. The Court uses the following abbreviations for documents submitted to the Court: Record = R.; Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment = Defs.Mot.; Defendants' Concise Statement of Facts = Defs. CSF; Plaintiff's Opposition to Defendants' Motion = Pl.Opp.; Plaintiff's Concise Counter Statement of Facts = Pl. CSF; Defendants' Reply = Defs.Rep.

4. The Court notes that the Felix Complaints Resolution Office, to which Plaintiff's parents complained about the lack of the academic component of his IEP after the teacher left

Kapaola, found that appropriate education was administered to Plaintiff by other staff members until his departure in mid-March. *See* R. at 90–91.

5. Defendants presented the testimony of Patricia Mravcak, a special education teacher who had worked with Plaintiff. Mravcak testified that: "[Plaintiff] wasn't clinically discharged, to my knowledge," R. at 226; that on March 17, 1999 "Kapaola was still willing to have Matthew continue in their program," *id.;* and, also as of March 17, 1999, that "[Kapaola] still would have been an appropriate place for [Plaintiff] to have with instruction.... But it was that parents didn't want him to return back to that program." R. at 228.

charged" against his will after he spent the night at home on doctor's orders to recuperate from an injury.[6] Although they disagree on who instigated the change of placement, the parties agree that the end result was that Plaintiff was not receiving an education as of March 13, 1999.

About the same time as Plaintiff departed from Kapaola, his 1998 IEP was about to expire. A new IEP was drafted for Plaintiff on March 17, 1999. The IEP, signed by Plaintiff and his parents as well as various school officials, noted that "[i]n all academic areas Matt falls within the average range." *See* R. at 22. The IEP listed a diploma as his graduation option. *See* R. at 23. Furthermore, the statement "I understand that the receipt of a diploma will terminate special education services" was initialed by Plaintiff's father.[7] *See id.* The IEP also contained a section titled "Statement of Needed Transition Services." This section included four subheadings which correspond to the definition of "transition services" in 20 U.S.C. § 1401(30). In the "instruction" section, it was noted that Plaintiff had 19 credits towards graduation (out of a necessary 22) and that "[h]e needs to continue to take the courses that will allow him to receive a diploma." *See* R. at 252. The "community experiences" section noted that Plaintiff attends church group. The "employment preparation/post school adult living" section put forth three aims: 1) Plaintiff "will take a career kokua interest survey," 2) Plaintiff would "begin to explore Leeward Comm[unity] College," and 3) and "Matt can explore DVR [Department of Vocational Rehabilitation] adult program." Both Defendants and Plaintiff's family were listed as being responsible for attaining the employment preparation goals. Finally, the fourth subsection, "daily living skills," was noted to be not applicable to Plaintiff. *See* R. at 23. It should be noted that at this point, Plaintiff was living at home and receiving no educational services.

On April 9, 1999, an IEP meeting was held in which Plaintiff's situation (staying at home and receiving no education) was discussed. The decision was made to find a home tutor for Plaintiff until partial hospitalization or day treatment center could be found. *See* R. at 26 (notes of Apr. 9, 1999 meeting). Later that same day, Plaintiff filed a request for an impartial due process hearing. *See* Defs. CSF ¶ 1. In the request, Plaintiff complained that he was not receiving any educational services and had not been for six weeks. Plaintiff alleged that the home hospital setting (which had been agreed to earlier that day) lacked tutors. Plaintiff also complained that his IEP dealt insufficiently with transition services. *See* R. at 2–3. Plaintiff demanded six [8] weeks of compensatory education as a remedy. He also asked for attorneys' fees and costs. *See id.*

Another meeting to discuss Plaintiff's IEP was held May 13, 1999. *See* Defs. CSF ¶ 2; Pl. CSF ¶ 2. At that meeting, Plaintiff's March 17, 1999 IEP was discussed and amended to allow for "extra school year" ("ESY") education. In other words, the parties agreed to give Plaintiff summer school. *See* R. at 24 (handwritten notes on the March 17, 1999 IEP making Plaintiff ESY eligible); R. at 31–33 (notes of meeting discussing need for ESY). This ESY was designed to make up for the

---

6. Plaintiff says he suffered a mild concussion during a Kapaola function on March 12, 1999. *See* R. at 174–76. That evening, he went home for visit and complained of a severe headache. His father took Plaintiff to an emergency room and, upon the hospital's suggestion, kept Plaintiff home for observation instead of returning him to Kapaola per program rules. *See id.* The next day, when his parents tried to take him back to Kapaola, they were told that Plaintiff had been "administratively discharged." *See also* R. at 149–51.

7. Plaintiff was born in April of 1981 and therefore, at the time of the IEP, was only 17.

8. In his complaint, Plaintiff requested eight weeks of compensatory education. *See* Complaint at 8.

time earlier that spring when Plaintiff was not receiving his education because of the disruption after he departed Kapaola. *See* R. at 237–38.

Despite the changes made to Plaintiff's IEP, and despite the plan to administer ESY, the administrative hearing went forward as scheduled. It was held on May 25, 1999 in front of administrative hearing officer Jeff L. Hossellman. Hossellman identified the following two issues as being before him:

1) Is student entitled to compensatory education as a result of interruption of special education services?

2) Were appropriate transition and mental health services provided?

R. at 106. Among the testimony offered that day was evidence that Defendants administered a career survey to Plaintiff and that Plaintiff was given copies of the results to consider and share with his family (*See* R. at 180, 252–54). There was also testimony that Plaintiff had been attending driver's education classes, in an attempt to both integrate into a classroom setting and gain independence. *See* R. at 162, 203–04. Witnesses testified that Defendants invited Plaintiff to and he did attend tours of two community colleges. *See* R. at 160–61, 180, 254–55. While at Leeward Community College, Plaintiff "received stuff on how to get ready for college" such as "how to enroll" and "what courses I would need to be taking." R. at 161 (Dep. of Pl.). Finally, there was testimony that Defendants gave Plaintiff, then eighteen, and his parents telephone numbers and a contact at the Department of Vocational Rehabilitation. Defendants were told by the DVR to

have Plaintiff call directly instead of them being an intermediary. *See* R. at 255.

Hossellman issued his Decision and Order June 29, 1999. In his order, Hossellman concluded that Plaintiff had unilaterally withdrawn from his residential treatment program on March 12, 1999 and that until that withdrawal, was receiving a free appropriate public education. He noted the new IEP that was drafted March 17, 1999. He found that between March 17, 1999 and April 9, 1999 the school was in the process of developing and implementing the IEP. Finally, he found that home schooling had commenced on April 14, 1999. The hearing officer concluded that the Plaintiff's disrupted education was caused by his own unilateral actions. He also concluded that the school was complying in good faith in the IDEA to implement new placement. Finally, he concluded that Plaintiff's free appropriate public education had not been denied by the brief interruption caused by Plaintiff. *See* R. at 106–09. He did not directly address Plaintiff's transition services claim.

Plaintiff filed his appeal of the hearing officer's order before this Court in a complaint filed July 21, 1999.[9]

At some point after the May 25, 2000 administrative hearing, Plaintiff received the ESY education agreed upon at the May 13, 2000 meeting. *See* Defs. CSF ¶ 10. Plaintiff does not dispute this.[10] Additionally, at some point Plaintiff was found to have earned the additional credits to graduate from high school. *See* Defs. CSF ¶ 8; Ex. A, Defs.Mot. (school transcript).[11]. Furthermore, in his IEP "Annu-

---

**9.** Plaintiff's complaint lists three claims: 1) that the Defendants did not follow proper procedures in developing Plaintiff's Individualized Educational Program; 2) that Defendants did not provide transition services as required; and 3) that Plaintiff was denied a free and appropriate public education because he was denied education for eight weeks and services later provided were inadequate. These three claims raise the same questions as the two issues enumerated before the administrative hearing officer. Because

both Defendants and Plaintiff in their briefs present issues as they were before the hearing officer, and not the way Plaintiff enumerated his complaint, this Court will, too.

**10.** Plaintiff's attorney, at the hearing on this motion, agreed that Plaintiff received the ESY.

**11.** Plaintiff disputes that he really earned these credits. *See* Pl. CSF ¶ 8. The evidence cited in support of Plaintiff's position does not

al Goal/Progress Report Plaintiff was found to have achieved progress (in some categories only "a little progress" as noted by the "-P" designation," but progress nonetheless) in all goals during the 1998–99 school year and the ESY that summer. *See* R. at 41–45, 218. Moreover, Plaintiff had already passed, in his junior year, the Hawaii State Test of Essential Competencies. *See* Ex. B, Defs.Mot.; Defs. CSF ¶ 7. Plaintiff was accordingly issued a high school diploma. *See* Defs. CSF ¶ 9; Defs. Mot. at 3 & Ex. C. Plaintiff's attorney, in her declaration attached to Plaintiff's concise statement of facts, notes that she "advised the Plaintiff to reject the award of his high school diploma until his education is satisfactorily completed under the IDEA."

Defendants filed their Motion to Dismiss, or in the Alternative, for Summary Judgement on January 25, 2000. On January 26, 2000, pursuant to Local Rule 56.1, Defendants filed their Concise Statement of Facts. Plaintiff filed his opposition to Defendants' motion and his Concise Counter Statement of Facts on February 17, 2000. Defendants filed a reply on February 24, 2000. This Court held a hearing on the motion on March 6, 2000.

## DISCUSSION

### I *The Parties' Arguments*

Defendants move for dismissal, or alternatively, for summary judgment on all claims in Plaintiff's complaint. First, Defendants argue on the merits. They maintain that Plaintiff is not owed any compensatory education because he unilaterally caused the interruption in his own education when he was receiving a FAPE, and, 2) because Defendants already cured the self-imposed deficit in Plaintiff's education by providing him with ESY, compensatory education is unwarranted.

Second, Defendants argue mootness. They contend that regardless of why or by whom Plaintiff's education was interrupted, this appeal is moot. They maintain that they are obliged to provide Plaintiff with a high school education, they did so, and there is nothing more to do.

Regarding the transition services claim, Defendants argue that they did provide Plaintiff with a transition services plan that set forth educational, social, and vocational goals and how to attain them. Defendants maintain that this plan was carried out and therefore, they satisfied the IDEA.

In opposition, Plaintiff first insists that prior to his departure from Kapaola he was not receiving a FAPE. Second, he argues that he was wrongly removed from Kapaola, and therefore, the additional interruption of his education was Defendants' fault. Regarding his transition services claim, he argues there was no plan for Defendants to participate in, and Defendants "abandoned" him to carry out transition services on his own. Additionally, he argues that because transition services were denied to him, Defendants "cannot escape responsibility for satisfying education components simply by awarding graduation and a diploma." Pl.Opp. at 7. Finally, Plaintiff argues that there are questions of material fact about 1) whether transition services were provided at all; and 2) whether Plaintiff unilaterally withdrew from Kapaola.

### II *Plaintiff's Claim that Defendants Did Not Monitor or Implement His Transition Services Fails*

The Court will first examine Plaintiff's claim that he did not receive transition services in his IEP. There are two questions to answer when reviewing a school's IEP: 1) has the State complied with the procedures set forth in the IDEA; and 2) is the IEP reasonably calculated to enable the child to receive educational benefits. *See Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. The Court reaches its decision

support Plaintiff's claim of there being a dis-    pute, however.

based on the preponderance of the evidence.

Plaintiff contends that there are "genuine issues of material fact outstanding concerning the IEP's transition services." *See* Pl.Opp. at 5. The Court construes this as a statement that summary judgement is therefore improper. Plaintiff makes this same allegation in his Concise Statement of Facts in ¶¶ 3–4. However, nowhere does Plaintiff show a piece of evidence that establishes this statement. Instead, Plaintiff cites to his brief, which is not evidence, and to the March 17, 1999 IEP. The IEP is where Defendants cite to establish that there were transition services. *See* Def. Rep. at 4. The Court finds, therefore, that the parties agree that the appropriate place to look for the answer to this issue is at the IEP.[12] It is here that it will focus.

## A Defendants Complied With IDEA Procedures

■ The first question is whether Defendants complied with the procedures set forth in the IDEA regarding transition services. The requirements for transition services are set forth in 20 U.S.C. §§ 1401(30) & 1414(d)(1)(A)(vii)(II). *See supra.* The IEP for Plaintiff meets these statutory guidelines. His IEP sets forth goals for the completion of high school, becoming part of his larger community through a church group, finding out about careers that would suit and interest him, exploring local community colleges, and speaking with vocational counselors. This is clearly a sufficiently "coordinated set of activities" to "promote movement from school to post-school activities." *See* 20 U.S.C. § 1401(30). Plaintiff challenges the transition services, however, because "there are no responsibilities or actions noted for [Defendants] and because Defendant [sic] abandoned the Plaintiff to provide his own transition services." Def. Opp. at 6. Both arguments are specious.

Plaintiff's first argument attacks the transition service plan itself. His argument is based on the part of the statute that requires the IEP to determine which agencies are responsible to help the student with the transition from school. Plaintiff's IEP does so. *See* R. at 23. On the left side of the "Statement of Transition Services" there are goals and statements of what is being or should be done for Plaintiff. The goals are written "Matt will ...," "He needs ...," "Matt attends ...," etc. On the right side the "agency responsible" is listed. The departments of Health and Education are both listed on the right side, as is Plaintiff's family, where appropriate. Plaintiff argues that the left-side "narrative" shows that the Defendants are "clearly" not responsible for anything because only his own name is listed. The Court is not persuaded. The Court finds that because Defendants are listed as "agency responsible" they clearly had responsibilities to Plaintiff under the IEP as written.

Plaintiff's second argument attacks the enforcement of the transition services and is only slightly less unbelievable. He argues, "In actuality and as a point of material fact, the Defendant abandoned the Plaintiff to provide his own transition services." Pl.Opp. at 6. This is simply false. As explained in the background section, Plaintiff was given a career test *by Defendants*. He was taken to two community colleges *by Defendants*. Plaintiff himself admitted that when at the colleges he "received stuff on how to get ready for college" such as "how to enroll" and "what courses [he] would need to be taking." *See* R. at 161. Furthermore, Plaintiff was given information on how to contact a vocational counselor *by Defendants*. Defendants also, of course, helped him with taking the courses that eventually led to him earning his diploma. Additionally, Defendants took him to inquire about earning a

---

**12.** Additionally, as explained in *Wartenberg,* in an administrative appeal such as the instant case, there will necessarily be issues of material fact in dispute, but that will not preclude summary judgment. *See supra.*

driver's license to increase his independence. Plaintiff's argument that Defendants "abandoned" him to carry out his own transition services is both devoid of any evidentiary support and completely contrary to evidence in the record. Accordingly, the Court finds that Defendants met the first prong of *Rowley* because they complied with the procedures set forth in the IDEA.

### B The IEP is Reasonably Calculated to Enable the Plaintiff to Receive Educational Benefits

The second question under *Rowley* is if the IEP is reasonably calculated to enable the child to receive educational benefits. The Ninth Circuit also asks whether the child made progress towards the goals set forth in the IEP. Under either scheme, the Court finds that the IEP, with the transition services plan, was sufficient. First, the initial goal of the transition services part of the IEP was that Plaintiff earn enough credits to graduate from high school. This is clearly reasonably calculated to achieve an educational benefit. As noted above, Plaintiff did more than make some progress towards this goal—he fully accomplished this goal. The IEP also sought for Plaintiff to know his options for attending college. Again, this goal was reasonably calculated to have an educational benefit and Plaintiff made progress towards this goal with his college visits. Finally, the IEP encouraged Plaintiff to learn about his job options by having him take a career survey and contact vocational counselors. Plaintiff made progress on this issue as well. He took the career survey, thereby getting more information about his employment options post-graduation. The Court finds that the second prong of *Rowley* was met by Defendants. Accordingly, the Court finds that Defendants did not violate Plaintiff's IDEA rights regarding transition services because appropriate transition services were provided to him. Defendants' motion for

summary judgment on this issue is GRANTED.

### III *Plaintiff's Claim that He Was Denied a Free and Appropriate Public Education Because He Did Not Receive Educational Services For Eight Weeks is Moot*

██ The Court finds that it need not, and indeed, cannot reach the merits of Plaintiff's claim for compensatory education because his appeal is moot. As discussed in the facts section above, Plaintiff earned sufficient credits to graduate from high school. He passed the Hawaii State Test of Essential Competencies. He received ESY education to make up for the period of time where he did not receive instruction. Furthermore, as just discussed, he was not denied any transition services owed to him under the IDEA. Finally, notwithstanding his attorney's instructions to reject it, Defendants awarded Plaintiff a high school diploma. This dispute is clearly moot.

Under Article III of the Constitution, federal courts only have jurisdiction over "cases" and "controversies." *See* U.S. Const. Art. III, § 2, cl. 1; *Public Utilities Comm'n v. F.E.R.C.*, 100 F.3d 1451, 1458 (9th Cir.1996). A party must maintain a live controversy at all stages of review, not simply at the date the action is initiated. *See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 797 (9th Cir.1999) (en banc). "If an action or claim loses its character as a live controversy, then the action or claim becomes 'moot,' and we lack jurisdiction to resolve the underlying dispute." *Id.* at 797–98. "The court must be able to grant effective relief, or it lacks jurisdiction and must dismiss the appeal." *Public Utilities*, 100 F.3d at 1458.

There is no effective relief that this Court can grant to Plaintiff. It is undisputed that Plaintiff has received a high school diploma.[13] Furthermore, Plaintiff

---

**13.** Plaintiff's attorneys's instruction for him to    reject his diploma does not negate the fact

does not dispute Defendants' statement that he received, via "extended school year" instruction, education to make up for the interruption in the spring of 1999. Under nearly identical circumstances, the Seventh Circuit recently found an appeal under the IDEA moot. *See Board of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Nathan R.,* 199 F.3d 377, 378, 380–81 (7th Cir.2000) (appeal moot in case where student already graduated and received the contested compensatory education award); *compare Honig v. Doe,* 484 U.S. 305, 318, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (although dispute of 24 year old was moot because, after 21, a person is no longer protected, the dispute of a 20 year old who had not yet graduated from high school was not moot). The Seventh Circuit in *Nathan R.* held that "no action this court might take would affect his or the School's rights." *Id.* Similarly, no action that this Court could take could affect Plaintiff's or Defendants' rights. If this Court found for Defendants, it could not give the extra weeks of education back that they already gave to Plaintiff. Conversely, if this Court found for Plaintiff, it could not order the compensatory education he seeks because he is not entitled to post-high school education. *See Parents of Student W v. Puyallup Sch. Dist.,* 31 F.3d 1489, 1497 (9th Cir.1994) (court did not address mootness specifically, but in denying compensatory education to a student who did not receive services required by IDEA at all times during high school years, but still graduated, court noted that, "There is no obligation to provide a day-for-day compensation for time missed. Student W. was able to graduate from high school, before reaching age 21, without more services than provided for in his annual IEP. The IDEA promises him nothing more."). Finally, this Court cannot give Plaintiff the other remedy he seeks—an injunction against Defendants graduating him—it is too late. Plaintiff's diploma has been earned and awarded.

This Court cannot un-graduate Plaintiff now.

The instant dispute is also analogous to a Sixth Circuit case where mootness was found after a student graduated from high school. *See Sandison v. Michigan High Sch. Athletic Ass'n, Inc.,* 64 F.3d 1026 (6th Cir.1995). A district court granted a preliminary injunction allowing nineteen year old students to participate in cross country meets despite an athletic association rule limiting participation to eighteen year old students. *Id.* at 1028–29. The appellate court found the controversy moot because the track season had ended and the plaintiffs had graduated from high school. *Id.* at 1029–30. As the court said, "the plaintiffs will have no more races to run." *Id.* at 1029. Like the plaintiffs in *Sandison,* Plaintiff's graduation means that the controversy will not arise again between these parties. Plaintiff cannot demand more education because he has already graduated. Similarly, Defendants cannot be accused of withholding Plaintiff's IDEA rights because they already provided them.

The instant case is distinguishable from *Wartenberg,* a Ninth Circuit case in which mootness was not found. The school district in *Wartenberg* appealed a hearing officer's decision that an IEP was inappropriate and that the parents were entitled to reimbursement for monies they spent on private school. *See* 59 F.3d at 889. Before the action reached the appellate court, the child graduated from high school. The parents, opposing the appeal, argued that because the child was no longer protected by the IDEA, the appeal was moot. The court disagreed, finding that the parents' claim for reimbursement of the private school tuition was a live controversy. *Id.* at 890. *Wartenberg* is distinguishable because the court could still grant effective relief if it decided that the school did not owe the parents reimbursement. In contrast, here, Plaintiff already received education to make up for the weeks he was "deprived," earned his cred-

that he has satisfied all state requirements for,

and therefore has earned, a diploma.

its, and has graduated. Plaintiff has no monetary claim before this Court. There is no relief that this Court can give. *See also Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 5 n. 3, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (Supreme Court noted that an IDEA dispute was still a live controversy, despite the student's graduation, because his parents sought reimbursement of monies spent).

■ Even if a case or action would otherwise be moot, if it fits into one of three exceptions, a party can avoid dismissal. First, there is an exception for cases that are capable of repetition while evading review. *See Public Utilities*, 100 F.3d at 1459. This exception applies only in exceptional circumstances. *Id.* To fit the exception, "a controversy must meet two requirements: (1) the challenged action was in duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* The second exception exists when a party voluntarily ceases its allegedly illegal conduct and there is a reasonable expectation that the wrong will be repeated. *Madison Sch. Dist.*, 177 F.3d at 799. The third exception bars a finding of mootness if a petitioner would suffer "collateral legal consequences" if the actions appealed were allowed to stand. *Id.*

None of the above exceptions to mootness apply to save Plaintiff's appeal. First, the "capable of repetition" exception is clearly inapplicable because Plaintiff's graduation precludes the repetition of another controversy over whether Defendants have violated Plaintiff's IDEA rights. *See Sandison*, 64 F.3d at 1030 (similarly holding that graduation of students precluded any repetition of a controversy about running track again). Additionally, Plaintiff does not satisfy the exception's other requirement (i.e., that the duration of the action is too short to be fully litigated) merely because his case was not litigated fully before his gradua-

tion. *See, e.g., Madison Sch. Dist.*, 177 F.3d at 798 (in graduation prayer case, court "acknowledge[d] that [such] cases are difficult to litigate fully," but the fact the one before the court faced such difficulty was inconsequential because some graduation prayer cases are able to be fully litigated). Many IDEA cases are able to be fully litigated. *See, e.g., Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467 (1993) (case reached court of appeals without mootness problem).

The "voluntary cessation" exception to mootness is also inapplicable. No party in this action voluntarily ceased doing anything. Furthermore, Plaintiff's graduation means that there is no reasonable expectation that the "wrong" against him will be repeated.

Finally, the "collateral consequences" exception is not applicable either. This exception is usually used to avoid mootness in habeas corpus proceedings where the petitioner has already obtained the relief sought. *See Public Utilities*, 100 F.3d at 1460. Plaintiff did not argue, and this Court cannot fathom, that any collateral legal consequences would result from this action being held moot.

For these reasons, the Court finds the appeal of the hearing officer's award moot. The Court thereby GRANTS Defendants' motion to dismiss Plaintiff's appeal of his claim for compensatory education.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's transition services claim and GRANTS Defendants' motion to dismiss Plaintiff's appeal of his claim for compensatory education.

IT IS SO ORDERED.