# United States Court of Appeals
## For the First Circuit

No. 03-1988

LT. T.B. and E.B., on behalf of their minor son N.B.; N.B.,

Plaintiffs, Appellants,

v.

WARWICK SCHOOL COMMITTEE; WARWICK SCHOOL DEPARTMENT; ROBERT
CUSHMAN, FRANK PICOZZI, JOYCE LYNN ANDRADE, JOHN F. THOMPSON,
PH.D., ROBERT J. SHAPIRO, and JOSEPH A. HARRINGRON, in their
capacity as members of the Warwick School Committee,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, Chief U.S. District Judge]

Before

Boudin, Chief Judge,
Campbell, Senior Circuit Judge,
and Lynch, Circuit Judge.

Peter F. Carr, II, with whom Eckert Seamans, Cherin & Mellott
LLC, James T. Murphy, and Hanson Curran LLP were on brief, for
appellants.

Jon M. Anderson, with whom Darlene K. Alt and Edwards & Angell
LLP were on brief, for appellees.

March 18, 2004

**LYNCH**, <u>Circuit Judge</u>.  This case concerns a claim under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 <u>et seq.</u>, for tuition reimbursement for the private school placement of an autistic child after his parents rejected the plan offered by the public school.

**I.**

The B.'s moved to Warwick, Rhode Island from Georgia on April 11, 2000, when Lt. T.B., an officer in the United States Navy, was reassigned.  One of the children, N.B., suffers from autism.  N.B. had been in a special needs kindergarten program in Georgia and was almost seven at the time of the move.  Mrs. B first contacted the Warwick School District on March 29, 2000 to find out what special educational services would be available for N.B. in Warwick.

Warwick acted quickly.  It sent a letter to Mrs. B on April 4 to schedule a meeting, reviewed N.B.'s records, and assembled a team, which met on April 13 with Mrs. B and her advocate from Families for Early Autism Treatment.  On April 13, Warwick proposed an initial Individualized Educational Program (IEP) for N.B., which would be subject to review several weeks after N.B. started school.  The IEP would have kept N.B. in a self-contained Warwick classroom that had been recently established for autistic children of his age and that used a modified version of educational techniques known as Treatment and Education of Autistic

and Communication-Handicapped Children (TEACCH). The B.'s rejected the IEP and gave notice of their intent to enroll N.B. instead in a private school, the Pathways Strategic Learning Center, which uses a different technique known as Discrete Trial Training (DTT). On May 4, Warwick proposed another IEP to the B.'s, who were accompanied by counsel at the meeting. The B.'s rejected that IEP, enrolled N.B. at Pathways, and requested a due process hearing.

The hearing officer, after a twenty-day evidentiary hearing in late 2000 and early 2001, sided with the B.'s. In a March 5, 2001 order, the hearing officer determined that Warwick had violated its procedural obligations under the IDEA. See 20 U.S.C. § 1415. This finding primarily reflected two concerns: (1) that Warwick lacked sufficient knowledge of N.B. to determine that non-DTT techniques would work for him when it proposed its IEP and (2) that Warwick had pre-determined that N.B. would be placed in the Warwick school system. As a result, the hearing officer reasoned that the burden shifted from the parents to the school system on the issue of the substantive adequacy of the IEP[1] and then concluded, based on a very brief analysis, that the school system had not met its burden. The hearing officer ordered Warwick

---

[1] This statement is puzzling because the school district always bears the burden in the due process hearing of showing that its proposed IEP is adequate. See Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003); E.S. v. Indep. Sch. Dist., No. 196, 135 F.3d 566, 569 (8th Cir. 1998); Clyde K. v. Puyallup Sch. Dist., No. 3, 35 F.3d 1396, 1398 (9th Cir. 1994); Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993).

to pay the costs of N.B.'s tuition at Pathways henceforth[2] and to reimburse the parents for the tuition they had paid from September 21, 2000, when Warwick received notice of the due process hearing, through the date of the hearing.[3]

Armed with their victory, the B.'s went to federal court seeking attorneys' fees and costs under 20 U.S.C. § 1415(i)(3)(B). Warwick counterclaimed, challenging the hearing officer's findings that it had committed material procedural violations and had denied N.B. a Free Appropriate Public Education (FAPE) in its proposed IEP. This time, the school system won. On June 6, 2003, the district court issued a careful 46-page opinion, finding that any procedural violations were not sufficiently material to justify rejection of the IEP or tuition reimbursement and that the proposed IEP did not substantively deny N.B. FAPE. Judgment was entered in favor of Warwick on its counterclaim, and the parents' request for attorneys' fees was dismissed.

On appeal, the B.'s argue that the district court gave insufficient deference to the hearing officer and that, in any

---

[2]    Specifically, the Hearing Officer found Warwick's proposed IEP to be inappropriate and the Pathways programs to be an adequate substitute. She then gave Warwick 45 days to complete a full initial evaluation of N.B. At that point, if Warwick still failed to come up with an adequate IEP, it would be obligated to pay N.B.'s tuition at Pathways thereafter.

[3]    The hearing officer also justified the tuition reimbursement order on the ground that the school system had violated its "stay put" obligations, but all parties agree this was in error and should be disregarded.

event, the court's conclusions were not supported by the record. At stake is whether Warwick must continue to pay N.B.'s tuition at Pathways and whether it must reimburse the B.'s for the tuition that they paid Pathways from September 21, 2000, when Warwick received notice of the due process hearing, until March 5, 2001, when the hearing officer issued her decision. Since the hearing officer's decision, Warwick has been paying N.B.'s Pathways tuition during the pendency of this action under IDEA's stay-put provision, 20 U.S.C. § 1415(j).

## II.

We find no basis to upset the district court's careful analysis and affirm largely on the basis of its opinion, with these comments.

Autism is very difficult for parents, as well as teachers, to handle, and there are divergent theories as to the best treatment. The B.'s are firm in their belief that their son will benefit only from the treatment program available at Pathways and are admirable in their efforts to do what they think is best for their son. Nonetheless, under the Supreme Court's decision in Board of Educ. v. Rowley, 458 U.S. 176 (1982), IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is "'reasonably calculated' to provide an 'appropriate' education as defined in federal and

state law." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992-93 (1st Cir. 1990) (quoting Rowley, 458 U.S. at 207 (1982)).

The B.'s argue that the 1997 amendments to IDEA, Pub. L. No. 105-17, 111 Stat. 37 (1997), changed this standard to require school districts to provide the "maximum benefit" to special needs children. They point out that the IDEA now contains legislative findings emphasizing the importance of training teachers to help special needs children "meet . . . , to the maximum extent possible, those challenging expectations that have been established for all children" and prepare them to "lead productive, independent, adult lives, to the maximum extent possible." 20 U.S.C. § 1400(c)(5)(E).

We do not interpret this statutory language, which simply articulates the importance of teacher training, as overruling Rowley. This court has continued to apply the Rowley standard in cases following the 1997 amendments, see, e.g., Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 33 (1st Cir. 2001), as have several of our sister circuits, see Mo. Dep't of Elem. & Secondary Educ. v. Springfield R-12, No. 02-3765, 2004 U.S. App. LEXIS 3883, at *14 n.7 (8th Cir. March 1, 2004); Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M., 356 F.3d 798, 802, 804 (7th Cir. 2004); A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 319 (4th Cir. 2004). And that is for good reason. The Rowley standard recognizes that courts are ill-equipped to second-guess reasonable choices that school

-6-

districts have made among appropriate instructional methods. Roland M., 910 F.2d at 992; see also Rowley, 458 U.S. at 207-08.

## A.    Standard of Review

The parties disagree over our standard of review. Warwick argues that our review is for clear error, whereas the plaintiffs argue that our review of the district court opinion is de novo and must accord "due weight" to the hearing officer's decision. We attempt to clarify the standard of review here. There is a distinction between the standard applied on the district court's review of the hearing officer's decision and that applied on this court's review of the district court's decision.

The district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an "independent ruling based on the preponderance of the evidence." Roland M., 910 F.2d at 989 (quoting Town of Burlington v. Dep't of Educ., 736 F.2d 773, 790 (1st Cir. 1984)). That independence is tempered by the requirement that the court give "due weight" to the hearing officer's findings. Id. (quoting Rowley, 458 U.S. at 207, and Colin K. v. Schmidt, 715 F.2d 1, 5 (1st Cir. 1983)). This intermediate level of review reflects the concern that courts not substitute their own notions of educational

policy for that of the state agency, which has greater expertise in the educational arena.[4]  Id. (citing Rowley, 458 U.S. at 207).

In the absence of a mistake of law, the court of appeals must uphold the district court's conclusion about the adequacy and appropriateness of an IEP so long as that conclusion is not clearly erroneous on the record as a whole.  Id. at 990; Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993).  The adequacy of an IEP is a mixed question of fact and law.  Roland M., 910 F.3d at 990.  Because this determination is, in essence, a judgment call, this court applies the clearly erroneous standard of review even when the district court does not hear evidence on its own.  See id. at 990 (expressly rejecting the argument that clear error review should not apply when the district court decides the case entirely on the basis of the administrative record).

## B.    Procedural Violations

The plaintiffs argue that the hearing officer correctly found that Warwick had an inadequate basis on which to evaluate the child.  In particular, they focus on the fact that Warwick had not met with N.B. and did not have a complete set of records at the time it met with Mrs. B.  IDEA regulations require that the team

---

[4]    Here, the district court successfully avoided this danger.  Warwick expressed an educational policy choice in its IEP, which the hearing officer rejected largely on procedural, not substantive, grounds.  In the end, by reversing the hearing officer's decision, the district court reinstated the policy choice of the school system.

members be "knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.552(a)(1). Whether the team must meet the child to perform an evaluation surely depends on the situation, particularly the availability of other information. There is no per se rule that unless the child is seen and heard by the team, the procedures for preparing an IEP have been violated. See Holland v. D.C., 71 F.3d 417, 422-23 (D.C. Cir. 1995); Carroll v. Capalbo, 563 F. Supp. 1053, 1058 (D.R.I. 1983) ("Nowhere in the regulations is there a requirement that school personnel must themselves perform the evaluation."). Here, Warwick did ask to meet with N.B., but Mrs. B. did not receive the request in time to allow the team to meet N.B. before the April 13 meeting.

As to the availability of other information, on March 30, before the family moved to Rhode Island, Mrs. B. delivered to Warwick a packet of materials that contained evaluations of N.B. made in Georgia within the last year by experts in the various fields in which N.B. had special needs. The school system reviewed the materials and asked her to sign a release so they could get more materials. Mrs. B., who was in the process of moving, said she did not get the request.

Warwick reviewed all the records available at the time, met with Mrs. B. for six hours over two different days (April 13 and May 4), and assembled a team with considerable expertise in

autism.   The team read the prior evaluations of N.B., along with additional evaluation materials provided by Mrs. B. at the April 13 meeting, and heard from his mother and her special education lawyer about various educational techniques that N.B. had tried.   The record also supports Warwick's contention that the IEP proposed on April 13 was an interim one, which would be reviewed one month later, after Warwick could study how N.B. responded to it.   The district court was warranted in finding that there was adequate information, in context, to prepare an interim IEP.   If no further information developed, that was because N.B. was never presented to or placed in the Warwick school system; he was instead enrolled in Pathways.

The other argument stressed by the plaintiffs is that Warwick never had an open mind about placements for N.B.   They point to a statement by a teacher, Ms. Brennan, that "[i]t was my understanding that [N.B.] was coming to my classroom so we would see him on April 13th, the day of the IEP meeting."   The district court found the plaintiffs' "pre-determined outcome argument" to be an over-reading of the teacher's statement, which could be read to mean only that she thought that N.B. was coming to her classroom to be evaluated before the IEP meeting.   This conclusion was not clearly erroneous.   Even if Ms. Brennan's statement is read as the B.'s urge, it is hardly surprising that Warwick expected to see Mrs. B.'s child in the classroom.   Mrs. B. herself told the school

-10-

system in her March 30 letter that her children would be "ready to attend school as of Tuesday, April 11, 2000." In any event, Ms. Brennan was just one member of a multi-member team, and the IEP was not solely her effort.

## C.    **Whether the Proposed IEP Provided FAPE**

A major theme of the plaintiffs' oral argument was that the IEP proposed by Warwick was not significantly different from a pre-school program that N.B. had attended in Georgia (a "multi-modality eclectic classroom," according to Mrs. B.), which had not worked. That experience, they say, taught N.B.'s parents that he needs constant one-on-one attention. As a result, they argue, only Pathways comes close to meeting his needs. At the administrative hearing, they provided expert evidence, in the form of an affidavit from Dr. Mozingo, of Pathways, that Warwick's proposed IEP was inadequate. They argue that the district court improperly rejected this expert evidence, on "credibility" grounds, in favor of evidence presented by Warwick's expert, despite reviewing only the administrative record and not hearing the competing expert witnesses for itself.

Warwick replies that its proposed IEP was different from the failed program in Georgia. Furthermore, if the proposed IEP did not work, Warwick says, it would have made adjustments, had it been given the opportunity to do so.

Neither the hearing officer nor the district court addressed the contention that the proposed IEP was no different than the failed program in Georgia. From the materials available to us, it is far from clear that the programs were the same. The Georgia class was twice as large as the class in Warwick's proposed IEP. In addition, unlike Warwick's program, the Georgia class was not specifically structured to address the needs of autistic children. Moreover, there is no evidence that the teachers in the failed Georgia program had the same extensive experience and training in working with autistic children that the Warwick teachers have.

The hearing officer's opinion devoted roughly one page to the substantive issue of whether the IEP provided FAPE. She rejected the testimony of Warwick's expert, Dr. Mesibov, on the grounds that he had not met personally with N.B. and that he did not observe one of Ms. Brennan's classes until several months after the IEP was proposed. Neither of those grounds was a reasonable basis on which to find the IEP inadequate. Dr. Mesibov, whose credentials were considerable, testified based on his review of N.B.'s prior educational history in Georgia, the progress reports from Pathways (where N.B. had started school), the testimony of others, and his observations of Ms. Brennan's class for autistic

-12-

children.[5]  The district court reasonably relied on Dr. Mesibov's testimony and on Warwick's well-trained teaching staff and track record of success with autistic children.

As for the plaintiffs' expert, Dr. Mozingo, the district court's opinion simply said that Warwick's expert, Dr. Mesibov, had considerably more expertise in the field and so his views would be afforded more weight.  The record is clearly sufficient to support that conclusion.

The district court also found that many elements of DTT, the method that the B.'s advocated, would be available through the Warwick program's use of the TEACCH techniques, including a considerable amount of one-on-one instruction.  There was no clear error in the district court's finding that the IEP was adequate.

Once the determination is made that the IEP was adequate, that ends the inquiry.  We need not consider whether other programs would be better.  G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948-49 (1st Cir. 1991).

---

[5]    The hearing officer also relied on Dr. Mesibov's "admission" that he "would not recommend a program without meeting both [the child and his or her parents]."  But Dr. Mesibov clarified later in his testimony that he meant that although he personally would not recommend placement of a child without such information, he felt that he had sufficient information here to evaluate whether N.B.'s placement, which had already been determined by others, was appropriate.

## III.

For these reasons, we **<u>affirm</u>** the judgment of the district court.