**Galina C. v. Shaker Reg. Sch. Dist.  CV-03-34-B   03/30/04**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Galina C., by and through**</u>
<u>**her mother, Judith Reed**</u>

   **v.**                                   Civil No. 03-34-B
                                          Opinion No. 2004 DNH 058
<u>**Shaker Regional School District**</u>

<u>**MEMORANDUM AND ORDER**</u>

Galina C. is a 14-year-old girl with learning disabilities who is entitled to special education and related services under the Individuals with Disabilities Act, 20 U.S.C. § 1400 et seq. ("IDEA").  Her parents placed her in private school after the Shaker Regional School District (the "School District") developed an Individualized Education Program ("IEP") for Galina that proposed to continue to provide her with special education services in a public school setting.  Galina's parents claim that they are entitled to an order requiring the School District to reimburse them for the cost of Galina's private school education.  Because I determine that the School District satisfied the IDEA's procedural requirements, the special education services proposed

in the IEP were reasonably calculated to allow her to receive educational benefits, and the School District could have implemented the IEP if Galina's parents had allowed her to remain in public school, I affirm the decision below.

## I.  BACKGROUND[1]

Galina attended Belmont Elementary School for first grade in 1996 and 1997.  In the spring of 1997, the School District tested Galina and identified her as having speech/language difficulties.[2]  Galina's parents and the School District attempted to address these difficulties by developing an IEP for Galina for the one-year period beginning on April 9, 1997.  At the end of the 1996-97 school year, however, Galina's parents unilaterally placed her at Canterbury Children's Center, a private school, and the School District discharged her to

---

[1]  The facts discussed herein are taken from the hearing officer's decision, and supplemented by the parties' joint statement of material facts and amendments thereto, the exhibits presented to the hearing officer, and the transcript of the due process hearing.

[2]  Over the years, Galina has received services for a variety of disabilities, including emotion and fine motor skill disabilities.

ChildFind.[3]

Galina repeated first grade at Canterbury Children's Center, and remained there for grades two and three (1997-2000). The School District provided Galina with occupational therapy and speech/language therapy by sending district staff to Canterbury Children's Center to work with her. At times, Galina's parents supplemented the therapy with private tutoring at their own expense.

In late 1999, Galina's parents requested that she take a battery of tests. She was evaluated in early 2000 for "Academic, Communication, Intelligence, Vision, Hearing, Motor, and Observation." (Joint Stmt. of Mat. Facts). This testing ultimately revealed that Galina's educational development was approximately a year-and-a-half to two years behind her peers.

In May 2000, Dr. Kemper, an independent clinical psychologist, evaluated Galina and diagnosed her as dyslexic. Dr. Kemper recommended in part that Galina should be educated in

---

[3] Participating school districts have a federal obligation to "locate, identify and evaluate all private school children with disabilities" using methods that are "comparable to activities undertaken for children with disabilities in public school." 34 C.F.R. § 300.451(b). ChildFind is the term used to describe this obligation.

a substantially separate environment together with other students with similar learning profiles and a student-teacher ratio no larger than 8:1. He also recommended a specific teaching method that he thought would best help Galina to maximize her learning potential. He described the recommended method as a diagnostic prescriptive, multi-sensory structured language-based program implementing specific techniques such as Orton-Gillingham or Lindamood-Bell Phonemic Sequencing (LiPS). Diagnostic prescriptive teaching involves continual evaluation by the teacher of whether the student is actually learning, followed by changes in the method of teaching depending on the results of the ongoing analysis of the student's comprehension level. Multi-sensory structured language-based teaching involves using different modes of instruction utilizing several of the child's senses (visual, auditory, kinesthetic, tactile) incorporated into an analytic, synthetic, systematic approach to language. Project Read, Orton-Gillingham, and Lindamood-Bell are examples of teaching methodologies developed according to this approach.

At the urging of Galina's parents, the School District revised Galina's IEP in the summer of 2000 to include many, but not all, of the specific educational programs recommended by Dr.

Kemper. For example, the IEP required Galina's regular education teachers to make accommodations suggested by Dr. Kemper. Her IEP also stated that teachers would use a "structured, systematic, multisensory, code emphasis reading/language approach such as Orton G, LiPs, Pro Read." (Sch. Dist. Ex. at 258). After the IEP was modified, part of the school day was used for extra tutoring and help with specific subjects and skills in the school's learning center.[4] In the learning center, Kathy McGhee, a full-time learning disability specialist for the School District and Galina's case manager, taught Galina using Lindamood-Bell and Orton-Gillingham techniques.[5] Galina's parents accepted the IEP on August 29, 2000, but limited it to three months. Galina returned to public school for fourth grade.

In November 2000, Galina's IEP team[6] met to formulate an IEP

---

[4] The learning center has at least one teacher trained in teaching students with learning disabilities. The number of students in the room at any given moment varies.

[5] In anticipation of this work, Ms. McGhee received training in these programs during the intervening summer.

[6] Under the IDEA's implementing regulations, an IEP is developed by a team that includes if applicable (1) the parents of the child; (2) at least one regular education teacher of the child; (3) at least one special education teacher of the child; (4) a representative of the public agency that can provide or supervise the specially designed instruction to meet the child's

-5-

for the remainder of that school year.  The resulting IEP was substantially the same.  It was subsequently amended in December 2000 to reflect new goals, since Galina had achieved some of the goals identified in the earlier IEP.

The 2001-2002 IEP was developed after similar discussions and testing.  In March 2001, the IEP team decided that Galina's math goals would be extended during the summer, and that the School District would provide services for her for that purpose through Ms. McGhee.  In May, her parents attended a meeting to develop a new IEP, but decided that the IEP would not be finalized until after testing.  That testing was conducted by Ms. McGhee.  On June 21, 2001, the IEP team met to review the testing results and concluded that Galina had made progress in all almost all areas.  Galina's teachers noted that she had made significant progress on all short-term objectives.  After subsequent discussions, an IEP was adopted and implemented for her fifth grade year.  The new IEP was substantially similar to its

---

unique needs, is knowledgeable about the general curriculum and the availability of resources; (5) someone who can interpret the instructional implication of evaluation results; (6) other individuals at the discretion of the parent or agency who have knowledge or expertise regarding the child or services personnel; and (7) the child, if appropriate.  34 C.F.R. § 300.344.

predecessors in that it called for placement in public school with eighteen hours per week in a modified classroom and eight hours per week in the learning center. Throughout her fourth and fifth grade years, Galina's teachers and parents repeatedly concluded that Galina was making academic progress.

As Galina approached the middle of fifth grade, her IEP team met to collaborate on the IEP for her sixth grade year. In November 2001, Galina's teachers concluded that she was doing well in reading, cursive writing, graphing, and measurement, and that they had noted improvement in her social interactions and independent reading. Galina's parents nevertheless requested that Galina take a battery of tests in early 2002 which would evaluate the efficacy of the IEP that was then in place. Galina's parents retained Dr. Kemper to perform the evaluation.[7]

Dr Kemper concluded that Galina was not making the progress that he would expect. He wrote that

> it is strongly recommended that [Galina] participate in
> a multisensory, structured, language intensive program

[7] Galina's parents insisted that testing be performed by someone with a Ph.D. and requested Dr. Kemper specifically. The School District agreed to an independent evaluation, but recommended that Linda Hanrahan, who has a Ph.D., complete the evaluation. Galina's parents rejected Dr. Hanrahan and retained Dr. Kemper at their own expense in February of 2002.

that is located in a substantially separate school, and will provide [Galina] with explicit, systematic, multisensory, language-based instruction that is integrated throughout *all* of her classes throughout the day. [Galina] will require a daily, individual, language arts tutorial that provides her with basic skills in the areas of both oral and written language. In addition, it is recommended that [Galina] receive summer special education services in order to ensure that regression effects do not occur during the summer vacation. Because [Galina's] psycholinguistic profile is basically unchanged since her initial Psycholinguistic Evaluation in May 2000, most of the recommendations made in that report are reiterated here. . . . [I]t is recommended that [Galina] be considered for alternative educational programming. Given the severity of her dyslexia, it is recommended that [Galina] be enrolled in a multisensory, structure language program. . . . [Galina's] multisensory, structured language program will need to be implemented within the context of substantially separate school that is devoted to addressing the needs of children who have significant language impairments. Student/teacher ratio should be small (a maximum of 8:1) in which direct teaching is performed in a systematic manner, with continuous review of previously learned information and the teaching of skills across various contexts, in order to facilitate generalization effects. It is extremely important that all of [Galina's] teachers have the training necessary to provide instruction in a multisensory, structured language program setting. In addition, [Galina] will require a daily, individual tutorial in which a multisensory, code emphasis program is provided for reading, spelling, and written language.

(Sch. Dist. Ex. at 174-75).

The IEP team met to discuss the Dr. Kemper's report and recommendations on May 3, 2002. Galina's parents brought their

advocate, Caryl Patten, to the meeting, and requested that Dr. Kemper's recommendations be adopted in the IEP. For example, they asked that Galina be taught with the method Dr. Kemper specified (Orton-Gillingham), and requested that the School District provide transportation to a private school so that Galina could be educated in a "substantially separate" environment. The School District team members thought that Dr. Kemper's test results may have been affected by Galina's anxiety, and suggested that the test scores seemed low when compared to their own experiences with Galina. The team agreed that Ms. McGhee would conduct more testing designed to evaluate the efficacy of the IEP then in place, and that she would send the results to the parents with a proposed IEP by May 31. Ms. McGhee's testing did not show as substantial a gap between Galena and her peers as Dr. Kemper had reported. Dr. Kemper explained during cross-examination at the due process hearing that most of the discrepancies between his results and those of the Ms. McGhee were not significant.

In the meantime, Galina's parents investigated the potential implementation of the IEP at Belmont Middle School, which Galina would attend were she to remain in the public school system.

They requested resumes of the people that would be teaching Galina, observed several classes, and requested that if Galina were to attend Belmont Middle School, that she be placed in the classroom of a specific teacher to whom they felt Galina would respond.

On June 7, 2002, Galina's parents and Ms. Patten met with School District staff and suggested numerous changes to the IEP. Many of their requested changes were incorporated. Near the end of the June 7 meeting, Ms. Patten suggested placement at Burnham Brook, a school that provides full-day integrated teaching using the techniques recommended by Dr. Kemper. Due to the lateness of the hour, Galina's parents and Ms. Patten suggested that the meeting be adjourned, and that the school team members think separately about placement and contact the parents later regarding their response.

Stacy Buckley, the School District's Special Education Director, subsequently telephoned Galina's parents and informed them that the team would not recommend a private school placement. The parents stated that they wanted further changes made to the IEP, and Ms. Patten faxed a copy of the IEP to the School District with the proposed changes. Most of the requested

changes involved details that would not affect how Galina would be taught, but rather would enable the IEP to be implemented at Burnham Brook. For example, they requested that the provisions describing the person responsible for providing Galina with services be changed from "Guidance Counselor and Classroom Teacher" to "Special Education teacher [] with strong background in structured language and diagnostic prescriptive teaching." (Sch. Dist. Ex. at 69). Burnham Brook does not have a guidance counselor, so without the change, it would be unable to implement that provision of the IEP.

Ms. Buckley received the fax with additional proposed changes from Ms. Patten on June 20. Ms. Buckley called Galina's parents and left a message indicating that she was going on vacation and would discuss the proposed changes with staff when she returned. Ms. Buckley conferred with staff and sent Galina's parents a letter and a revised IEP on July 2, which incorporated some changes but rejected others, and offered reasons why School District personnel felt that the unincorporated suggestions either were unnecessary or would hinder Galina's progress.

By letter dated July 16, Galina's parents indicated that they wanted to mediate the remaining differences in the IEP.

-11-

They suggested that they would be available for meetings on specific dates in mid to late August, including noon to three on August 27. Lastly, they stated that they were upset that a meeting regarding placement had been apparently been held without them on June 12, as they felt that at the June 7 meeting they had only agreed to have Ms. Buckley "check with other team members, not . . . schedul[e] a meeting without [them]." (Sch. Dist. Ex. at 20-21).

Ms. Buckley sent a letter to Galina's parents on August 6, which indicated that a conversation with Galina's mother had taken place a few days earlier and that Ms. Buckley was sending a copy of the signature pages of the School District's final proposal for the IEP and placement. Ms. Buckley requested that Galina's parents sign the IEP, indicating either disagreement or agreement. On August 13, Galina's parents replied by letter, stating that they felt the proposed placement and IEP were not appropriate for Galina, and that they intended to enroll her at Burnham Brook and seek reimbursement for her tuition and related expenses. They stated that placement was the only "major dispute" regarding the final IEP, and they did not sign the IEP documents. (Sch. Dist. Ex. at 10).

On August 15, 2002, Ms. Buckley indicated in another letter to Galina's parents that the School District understood that the parents had rejected the proposed IEP and placement. The School District again requested that Galina's parents sign the documents indicating acceptance or rejection of the IEP. In that letter, Ms. Buckley indicated that she had spoken to Galina's mother the day before, and proposed a meeting on August 27 in the morning, although she noted that the district did not feel further meetings or mediation would be productive.

On August 18, Galina's parents sent Ms. Buckley an email stating that they were not available on the 27th in the morning and that their letter had indicated that they were only available in the afternoon on the 27th. Responding by email on August 20, Ms. Buckley rescheduled the meeting for 12:30 p.m. on the 27th. Subsequently, Galina's parents learned that their advocate was no longer available at that time, so they cancelled the meeting the day before it was to take place.

Meanwhile, Galina began attending Burnham Brook. Another team meeting was scheduled for September 13, 2002, which Galina's father cancelled on September 11. On September 12, the School District initiated a Due Process Hearing because it could not

-13-

register Galina in ChildFind without issuing the IEP. A mediation was set for October 1, 2002, which was also cancelled. Galina's parents elected to use the due process hearing to request reimbursement for the private school tuition and related costs.

The due process hearing was held on November 4, 8, and 12,[8] 2002 before Hearing Officer Amy Davidson. Galina's parents used the hearing to challenge both the sufficiency of the IEP and the ability of the School District to implement it. The School District presented evidence and testimony supporting its contention that the IEP was adequate and that Belmont Middle School could implement it.

At the hearing, Galina's parents presented the testimony of Dr. Kemper and Colleen Sliva, a teacher and learning disability specialist at Burnham Brook, both of whom stated that Galina would benefit from the program at Burnham Brook. Ms. Sliva testified that Burnham Brook was essentially implementing the IEP and that Galina was doing well. The School District presented testimony from some of the people who would have taught Galina

---

[8] An earlier date was rejected by the parents who requested more time to prepare.

and implemented various parts of the IEP at Belmont Middle School.

Galina's parents claimed that the hearing was the first time that they were told who Galina's teachers would be. They objected to some of the teachers' credentials, saying that the teachers were not certified or trained in the methods the parents had insisted be included in Galina's IEP. Further, her parents attached great importance to the fact that School District personnel were not familiar with some of the terminology associated with the method of teaching they advocated.

After the due process hearing, the hearing officer issued her opinion finding that the IEP was developed in a procedurally sound manner, that it was sufficient, that the School District could implement it, and that Galina's parents were not entitled to reimbursement for her private school tuition. Galina's parents appealed to this court.

## II. ANALYSIS

Plaintiffs' arguments can be grouped into three categories for purposes of analysis: (1) procedural complaints; (2) adequacy complaints; and (3) capacity complaints. I first discuss the

IDEA and then consider each of plaintiffs' arguments in turn.

## A.    The IDEA

The purpose of the IDEA is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).[9] A disabled child's right to a free and appropriate public education is assured by the development and implementation of an IEP.  See Honig v. Doe, 484 U.S. 305, 311-12 (1988).  An IEP must contain both a statement of the child's "present levels of performance" and "a statement of the special education and related services and supplementary aids and services to be provided to the child."  20 U.S.C. § 1414(d)(1)(A).  IEPs must be revised not less than annually.  See id. § 1414(d)(4)(A).

The IDEA also provides children with disabilities and their parents with a number of important procedural safeguards.  See

_____

[9]  New Hampshire implements the IDEA through its special education law,  N.H. Rev. Stat. Ann. § 186-C, and adopts by reference the federal regulations as to special education for disabled students in private schools.  N.H. Admin. Rules, Ed. 1117.03 (2003).

id. § 1415(a). A disabled child's parents must be included as part of the team that develops and reviews a child's IEP. See id. § 1414(d)(1)(B). Parents are also entitled to: (1) examine all records relating to the child; (2) participate in meetings concerning the child's educational placement; (3) obtain an independent educational evaluation of the child; (4) receive written notice of any proposal to alter or to refuse to alter the child's educational placement; and (5) present complaints with respect to any matter relating to the identification, evaluation or educational placement of the child. See id. § 1415(b).

The IDEA does not require school districts to pay for tuition at private schools except under limited circumstances. Greenland Sch. Dist. v. Amy N., 358 F.3d 150 (1st Cir. 2004). Parents who place their children in private school without the prior consent of a School District do so at their own financial risk. Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 373-77 (1985). In general, a school district is not required to reimburse parents for a unilateral private school placement if the school district has made a free appropriate public education ("FAPE") available to the child. 20 U.S.C. § 1214 (A)(10)(c)(i). A court or a hearing officer may require a school district to

-17-

reimburse parents for private school tuition, however, if it finds that the school district did not make FAPE available in a timely manner prior to the private school placement. 20 U.S.C. § 1214 (A)(10)(c)(ii). Lastly, even if a court or hearing officer finds that the school district did not offer FAPE, reimbursement may be reduced or denied if the parents did not provide notice of their rejection of the IEP as required by 20 U.S.C. § 1214 (A)(10)(c)(iii). As always, every parent is free to obtain for their children the best education available. However, under federal and New Hampshire law, a school district is only required to pay for an "appropriate education" as defined by the IDEA.

Judicial review of a challenge under the IDEA is twofold: whether the school district "complied with the procedures of the Act, and whether the IEP developed through those procedures is 'reasonably calculated to enable the child to receive educational benefits.'" Kathleen H. v. Mass. Dep't of Educ., 154 F.3d 8, 11 (1st Cir. 1998) (quoting Board of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982)). I therefore proceed to consider the procedural violations first. My review is one of "involved oversight." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990).

## B. The Procedural Violations

Galina's parents assert that their ability to participate in the IEP process was impeded because (1) the School District did not prepare the IEP in a timely fashion; (2) Galina's sixth grade regular education teacher did not attend the IEP meetings; (3) the School District held a meeting regarding placement to which it did not invite her parents; and (4) the School District decided the issue of placement prior to finalizing the IEP. I will set aside an IEP based on a procedural deficiency only if I find "'some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.'" Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992) quoting Roland M. v. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990); see also Lt. T.B. v. Warwick Sch. Comm., No. 03-1988, 2004 WL 528359 (1st Cir. 2004).

Galina's parents first assert that they were required to place Galina at Burnham Brook while continuing to negotiate with the School District over details of the IEP because the School District did not develop the IEP in a timely fashion. I

-19-

disagree. 20 U.S.C. § 1414(d)(2) requires that an IEP be in effect at the beginning of the school year. The School District had an adequate IEP available well before Galina's parents enrolled her in private school. Its willingness to continue discussions regarding points of contention does not make the IEP untimely.

Galina's parents claim a procedural violation in that Galina's regular teacher for the 2002-2003 (sixth grade) year was not present at the June 7, 2002 meeting and did not help develop the IEP. They rely on 34 C.F.R. § 300.346(d).[10] The hearing officer found no violation because: (1) Galina's fifth grade regular education teacher was present for most of the June 7 meeting and helped develop the IEP; (2) Galina's proposed sixth grade regular education teacher was scheduled to attend an August 27 meeting, but her parents cancelled it; and (3) the regulation can be satisfied by the presence and participation of either a future or present regular education teacher. I agree with this assessment.

---

[10] 34 C.F.R. § 300.346(d) reads: "the regular education teacher of a child with a disability, as a member of the IEP team, must, to the extent appropriate, participate in the development, review, and revision of the child's IEP . . . ."

Galina's parents also accuse the School District of holding a team meeting to discuss placement on June 12, 2002, without inviting them. If true, this could potentially be violation of the IDEA's procedural requirements. Parents have a right to participate in the development of the IEP. Roland M., 910 F.2d at 994. However, it was either Galina's parents or their advocate who first suggested that Ms. Buckley contact the school team members about the issue after the meeting, and inform the parents or their advocate of the staff's conclusions regarding placement. Having chosen to allow the School District personnel to discuss the issue separately, Galina's parents cannot now complain that they did so.

Lastly, Galina's parents claim that placement was predetermined rather than decided after the IEP was completed. I disagree. See Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992). Placement must indeed be determined after the IEP is formulated. See, e.g., 34 C.F.R. § 300.552(a)(2)(b)(2) ("each public agency shall ensure that . . . the placement decision . . . is based on the child's IEP"). In this case, however, there is no indication that the School District had decided where Galina would be placed before it prepared her IEP.

-21-

The School District first drafted the IEP and sent it to Galina's parents prior to the June 7, 2002 meeting. It included references to programs that are part of the School District, such as the Learning Center. After receiving that draft, the parents negotiated to have many of those specific references removed. At the June 7 meeting, her parents requested that the School District personnel consider placement prior to finalizing the IEP, contrary to ordinary procedure. Subsequently, the parents suggested further changes to the IEP, some of which were ultimately incorporated into the IEP.

These events indicate that the School District did not attempt to resolve the placement issue until the parents requested that School District personnel consider it. Further, even if the IEP had not yet been finalized, the changes suggested by the parents after that were minor, and the School District personnel were satisfied that the staff at Belmont Middle School could adequately provide Galina with an appropriate education and support services to enable her to receive FAPE. The School District should not be penalized for accommodating a parental request to consider placement while simultaneously discussing further minor amendments to the IEP. Lastly, I note that the

-22-

First Circuit has held that any error in the timing of placement decisions is harmless if the decision did not result in a deprivation of the child's right to an appropriate education or the parents' right to participate. Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992). Since I ultimately conclude that the School District did offer Galina FAPE, and the facts demonstrate that Galina's parents had ample opportunity to participate in the placement decision, I find no violation.

## C.   Adequacy of the IEP

An IEP is considered appropriate if it "provides instruction and support services which are reasonably calculated to confer educational benefits to the student" in the least restrictive environment. Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 50 (1st Cir. 1992). While parents are always free to seek optimal educational opportunities for their children, federal law does not require that "the benefit conferred [by the IEP] reach the highest attainable level or even the level needed to maximize the child's potential." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993); see also Lt. T.B v. Warwick Sch. Comm, No. 03-1988, 2004 WL 528359, at *2 (1st Cir. 2004). An IEP can provide FAPE even though it "may not be the *only* appropriate

choice, or the choice of certain selected experts, or the child's parents' *first* choice, or even the *best* choice," <u>G.D. v. Westmoreland Sch. Dist.</u>, 930 F.2d 942, 948 (1st Cir. 1991), <u>quoted in</u> <u>Amann v. Stow Sch. Sys.</u>, 982 F.2d 644, 651 (1st Cir. 1992) (emphasis in original).

The IDEA, however, does require FAPE, which courts have interpreted to mean that the school must provide "instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'" <u>Roland M.</u>, 910 F.2d at 987 (quoting <u>Board of Educ. v. Rowley</u>, 458 U.S. 176, 203 (1982)). Further, "Congress indubitably desired 'effective results' and 'demonstrable improvement' for the Act's beneficiaries." <u>Id.</u> at 991 (quoting <u>Burlington v. Dep't of Educ.</u>, 736 F.2d 773, 788 (1st Cir. 1984). The IEP must "guarantee some reasonable probability of educational benefit with sufficient supportive services at public expense in the least restrictive environment." <u>Hampton Sch. Dist. v. Dobrowolski</u>, 976 F.2d 48, 52 (1st Cir. 1992) (internal quotations omitted). To prevail, therefore, Galina's parents must show that the IEP was inadequate because there was no reasonable probability that Galina could benefit from it.

I review the record to see if a preponderance of the evidence supports the hearing officer's decision that the IEP was appropriate and that the School District could implement it. Roland M., 910 F.2d at 989. Educational policy is the particular expertise of the local educational authority. Id. at 993 (citing Lachman v. Illinois State Board of Educ., 852 F.2d 290, 297 (7th Cir. 1988)). Therefore, if the IEP proposed by the school is based upon an "accepted, proven methodology," I will not ordinarily find it unacceptable. Id. at 989-92 (recognizing that judges should give "due weight" to a state agency's decision in order to "prevent judges from imposing their view of preferable educational methods upon the States") (internal quotations omitted); see also Lt. T.B. v. Warwick Sch. Comm., No. 03-1988, 2004 WL 528359, at *2 (1st Cir. 2004) ("courts are ill-equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods"). In assessing the adequacy of the IEP, I do not consider whether Burnham Brook's program was "better" but only whether the School District's IEP was reasonably calculated to provide Galina with some educational benefit, and whether Belmont Middle School could implement it. Lt. T.B., 2004 WL 528359, at *2-3.

Galina's parents argue that not only was the most recent IEP inadequate, but also that her fourth and fifth grade IEPs and education pursuant to those IEPs were not adequate. To support this claim, they point to Galina's use of a third grade math text during fifth grade, and the fact that Galina never achieved any grade of "consistent, independent mastery" of any objectives for reading. Further, they note that her testing showed that she was not catching up to her peers. The School District states, however, that Galina did make progress in fourth and fifth grade. The hearing officer credited testimony from her teachers and documentation presented at the hearing that showed Galina had mastered many of her short-term goals and progressed in general. Further, while Dr. Kemper's analysis and prescription for Galina indicated that the fourth and fifth grade IEPs may have been deficient, the hearing officer noted that Dr. Kemper's conclusions contradicted every test performed by School District personnel, and that the School District's results may have been more reliable, since Galina knew and was comfortable with the people administering the tests. I find the hearing officer's analysis on this point persuasive. I therefore affirm the hearing officer's finding that Galina's IEPs were reasonably

-26-

calculated to provide her with educational benefits, which she in fact received.

Galina's parents also attach great significance to the fact the School District did not diagnose Galina as dyslexic, nor label her as such even after she was so diagnosed by Dr. Kemper in 2000. The Seventh Circuit's guidance on this point, however, is persuasive: "[t]he IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the child's] multiple disabilities." Heather S. v. Wisconsin, 125 F.23d 1045, 1055 (7th Cir. 1997); accord, J.W. v. Contoocook Valley Sch. Dist., 154 F. Supp. 2d. 217, 228 (D.N.H. 2001). Galina's parents have not demonstrated that her IEP would have been proposed any substantively different programming or services for Galina if it had labeled her as dyslexic. Therefore, the IEP was not deficient in its failure to use Galina's parents' preferred terminology for her disability.

Finally, regarding sufficiency of the IEP, I note that experts presented by her parents, including staff from Burnham Brook, considered the IEP to be generally appropriate. Dr. Kemper made it clear during cross-examination that he was unwilling to state categorically that the IEP was inappropriate.

-27-

Moreover, Colleen Sliva, one of Galina's teachers at Burnham Brook, testified that she thought the IEP was appropriate for Galina. In fact, in large part, Burnham Brook appears to have substantially implemented the IEP as written. In summary, for the above-stated reasons, I concur with the hearing officer's decision that the proposed IEP was adequate and appropriate.

### D.  Implementation of the IEP at Belmont

Galina's parents also challenge the School District's ability to implement the IEP at Belmont Middle School. In making this assertion, they rely on testimony from Dr. Kemper and Colleen Sliva that the School District's placement of Galina in a class with nineteen other students would make it impossible for a teacher to implement the "diagnostic prescriptive teaching" method required by the IEP. Also, Galina's parents expressed doubts about the availability of Ms. McGhee to administer services to Galina, and the qualifications of the other staff to teach using the methods specified in the IEP.

The hearing officer noted the testimony of Dr. Kemper and Ms. Sliva regarding the impracticability of educating Galina in a class size as large as twenty, but ultimately rejected it because neither Dr. Kemper nor Ms. Sliva had observed the methodologies

-28-

utilized by Dawn Stefan (the proposed regular sixth grade teacher), nor had they ever observed Galina in the School District's proposed setting. In contrast, educators who had observed her in fourth and fifth grade felt confident that she could be meaningfully educated in what would be a similar student/teacher ratio at Belmont Middle School. I, too, find the testimony of those who observed Galina in the larger classroom format valuable in determining whether Galina could benefit educationally at Belmont.

The hearing officer found that the staff at the School District was capable of administering the IEP in the manner Galina's parents requested. She credited the testimony of the teachers that they understood and were trained in the methodologies required. She implicitly found that the regular teacher's methodologies (use of work-stations involving groups of students no larger than five, team teaching, teachers' assistants and special education teachers in the room) would allow her to effectively use a diagnostic prescriptive teaching method. I agree with those findings.

Regarding the availability of personnel, the fact that Ms. McGhee's current schedule is full does not mean that had Galina

attended Belmont Middle School, Ms. McGhee would have been unable to allocate time for her. Since Galina was not at Belmont, Ms. McGhee was able to work with students who she might otherwise have had to turn away or reassign to other staff. Therefore, I do not find this line of argument persuasive.

Lastly, Galina's parents' doubts about the abilities and training of School District staff are not supportable given the evidence produced at the hearing concerning their training and experience. Annie-Laurie Vomacka, the School District's learning disability specialist, (Tr. day 1, p. 278-87) and Dawn-Marie Stefan, Galina's proposed regular education teacher, (Tr. day 3, p. 24-28, 31) both testified that they understood and could teach using the methods described in the IEP.

## IV. CONCLUSION

For the reasons stated above, I affirm the decision of the hearing officer and find that, pursuant to 20 U.S.C. § 1412(10)(C), the School District is not required to pay for Galina's education at Burnham Brook because her parents unilaterally placed her there after they rejected the school District's

adequate IEP that proposed to place Galina in public school.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 30, 2004

cc:  Richard Cornelius, Esq.
     John P. Sherman, Esq.