# United States Court of Appeals
## For the First Circuit

No. 07-1708

C.G. AND B.S., AS PARENTS AND NEXT FRIENDS OF A.S., A MINOR,

Plaintiffs, Appellants,

v.

FIVE TOWN COMMUNITY SCHOOL DISTRICT ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]
[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Lynch, Circuit Judge,
Campbell and Selya, Senior Circuit Judges.

Staci K. Converse, with whom Richard L. O'Meara and Murray, Plumb & Murray were on brief, for appellants.
James C. Schwellenbach, with whom Drummond Woodsum & MacMahon was on brief, for appellees.

January 18, 2008

**SELYA**, **Senior Circuit Judge**.  This case requires us to examine the rights of a disabled child under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1415.  The principal issue, scantily addressed in the case law, involves how judicial review should proceed when the last individualized education program (IEP) proposed by the school system is incomplete.

Here, the district court found that the IEP's incompleteness was due to the parents' obstruction of the developmental process.  It proceeded to consider extrinsic evidence and concluded that, had the parents permitted the process to run its course, the school system would have provided the child with a satisfactory IEP.  On that basis, it decreed that the parents were not entitled either to reimbursement for costs incurred in a private placement or to compensatory education benefits.

The parents now appeal.  We conclude that the lower court committed no clear error in weighing the facts.  While we reach the same ultimate conclusion as did the court below, that court's meticulous factfinding allows us to take a different, more direct analytic path.  In the end, we affirm the judgment below.

## I.  BACKGROUND

The district judge, in the first instance, referred this case to a magistrate judge for a report and recommendation.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The magistrate judge

-2-

canvassed the record, made extensive findings of fact, and set forth various conclusions of law. C.G. & B.S. v. Five Town Cmty. Sch. Dist., Civ. No. 05-237 (D. Me. Feb. 12, 2007) [2007 WL 494994]. The district judge, in a summary order, adopted the magistrate judge's recommended analysis in its entirety and entered judgment accordingly. C.G. & B.S. v. Five Town Cmty. Sch. Dist., Civ. No. 05-237 (D. Me. Apr. 6, 2007). For simplicity's sake, we do not distinguish further between the magistrate judge and the district judge but, rather, take an institutional view and refer only to "the district court."[1]

We recount the background facts as supportably found by the district court. C.G. and B.S. are the parents of A.S., a teenage girl who suffers from an emotional disability. The family resides in Camden, Maine. Five Town Community School District (the School District) is the school system in which A.S. is entitled to receive public education.

The parents first met formally with Five Town about A.S.'s potential to qualify for services under the IDEA on March 3, 2004. They requested that the School District pay for A.S., who

---

[1]The district court appropriately engaged in a bounded, independent review of the hearing officer's decision, see, e.g., Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 52 (1st Cir. 1992), giving due deference to the hearing officer's determinations. Because the district court's findings and conclusions were essentially the same as those of the hearing officer, we for the most part eschew separate reference to the hearing officer's decision.

was then fourteen years old, to enroll in a private residential placement. Before the School District could evaluate the bona fides of this request, A.S. hit a crisis point and her parents unilaterally transferred her into a private residential placement outside of Maine. The parents do not seek to recover the costs of that placement in this appeal, so we make no further mention of it.

Notwithstanding efforts on the part of the School District to re-start the IDEA eligibility process, nothing of consequence happened for well over a year. In the interim (unbeknownst to the School District), A.S. returned to Maine, enrolled for several months as a residential student in a private school, and upon leaving spent two additional months without any scholastic affiliation.

In June of 2005, A.S.'s parents demanded a due process hearing under the IDEA. See 20 U.S.C. § 1415(f). The School District sought to meet with them in order to resume the earlier eligibility discussions. The due process hearing was deferred pending the completion of this attempt to reach a consensus.

The common practice is to form a team of parents, teachers, school administrators, and others to evaluate a child with a disability and, if she is found eligible for remedial services, to develop an IEP. See id. § 1414(d)(1)(B) & (d)(3). In Maine, this cohort is called a Peer Evaluation Team (PET). See 05-071-101 Me. Code R. §§ 1.4, 8.1. The School District assembled

-4-

such a team and scheduled the initial PET meeting for September 1, 2005. During that session, the parents agreed that an independent evaluator, Dr. Frank McCabe, could assess A.S.

After the PET participants received the evaluator's report, the School District scheduled a second PET meeting for October 12, 2005. At that session, the participants discussed the evaluator's assessment, concluded that A.S. qualified for services as a disabled child, and began work to develop an IEP. The participants jointly delineated the main components to be included in the IEP and noted areas of the IEP that would require additional input from A.S., her therapist, and her parents.

During the same meeting, some placement options were discussed. The independent evaluator indicated that A.S. could receive an adequate and appropriate education in a public school day program. In response, the School District described some public school options, including Camden Hills Regional High School (CHRHS) and the Zenith program. A.S. previously had attended CHRHS, and her parents expressed concern about a placement there. They seemed willing, however, to learn more about the Zenith non-residential day program or any similar regime.

The School District indicated that it would send the parents a copy of a proposed IEP prior to the next PET meeting. On October 18, 2005, it transmitted an IEP document to the parents by facsimile. The October 18 version of the IEP included the main

components of the program to which the participants previously had agreed. Consistent with the discussions at the October 12 conclave, however, the IEP left open other areas for later development. It is nose-on-the-face plain from even a cursory inspection of the October 18 submission that the IEP was not intended to constitute a completed IEP.[2]

The next PET meeting took place on October 20, 2005. At that session, the participants discussed placement options. The meeting was "very contentious." Five Town, 2007 WL 494994, at *18. The participants quickly reached an impasse: the parents insisted that A.S. be educated in a therapeutic residential setting, whereas the School District insisted that a non-residential public school placement could provide A.S. with an adequate and appropriate education. The meeting ended abruptly when the parents announced that they had decided to send A.S. to the F.L. Chamberlain School (an out-of-state residential institution) and would seek reimbursement for the costs incurred. The meeting never progressed to a discussion either of the IEP or of how to fill the gaps in it.

A.S.'s parents memorialized their unilateral placement decision in a letter sent the following week to the School

------

[2]For example, the October 18 IEP referenced an attached behavior plan but (as the parents knew) no such plan had yet been developed and, thus, none was annexed. This area of the IEP was intentionally left incomplete pending input from Dr. Miller (A.S.'s therapist). The IEP displayed several other inchoate provisions that obviously were meant to be fleshed out during further iterations of the IEP.

District.  Given this parting of the ways, the due process hearing moved forward.  Arguing that the School District's proposed IEP and refusal to sanction a residential placement betokened a failure to provide A.S. with a free and appropriate public education (FAPE), the parents sought compensatory education and/or reimbursement for the expenses incurred in educating A.S. at Chamberlain.  The School District denied any breach of its duties under the IDEA.  The hearing went forward, and the hearing officer ultimately rejected the parents' entreaties.

Undaunted, the parents shifted the battleground to the federal district court.  See 20 U.S.C. § 1415(i)(2)(A).  As previously noted, the district judge, on de novo review of the magistrate judge's report and recommendation, upheld the hearing officer's ukase.  This appeal followed.

## II.  ANALYSIS

In IDEA cases, as elsewhere, we review the district court's answers to questions of law de novo and its findings of fact for clear error.  Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 990-91 (1st Cir. 1990).  Clear-error review demands substantial deference to the trier; under that standard, we may reverse only if the record, read as a whole, gives rise to a "strong, unyielding belief that a mistake has been made." Lenn, 998 F.2d at 1087 (quoting Cumpiano v. Banco Santander P.R., 902

F.2d 148, 152 (1st Cir. 1990)).  Whether an IEP is adequate and appropriate is a mixed question of law and fact.  Thus, appellate review involves a degree-of-deference continuum, which takes into account whether particular aspects of that determination are fact-dominated or law-dominated.  Mr. I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 10 (1st Cir. 2007); see In re Extradition of Howard, 996 F.2d 1320, 1327-28 (1st Cir. 1993).

Here, the parents' chief argument is that the district court applied an improper legal rule in evaluating the October 18 IEP.  In turn, this argument depends on whether the IEP was complete (and if not, why not).  In addressing it, we will first step back and sketch the architecture of the IDEA.  Once this is done, we will consider the completeness of the proffered IEP, the cause of its stunted growth, whether the die was cast at that point, and the parents' prayers for relief.

## A.  The IDEA.

Congress designed the IDEA as part of an effort to help states provide educational services to disabled children.  Each state receiving federal funding through its provisions must ensure that every disabled school-age child receives a FAPE. 20 U.S.C. § 1412(a)(1)(A).  A FAPE encompasses special education and support services provided free of charge.  See id. § 1401(9).  A school system has met this obligation as long as the program that it offers to a disabled student is "reasonably calculated" to deliver

-8-

"educational benefits." Hendrick Hudson Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982); see Lt. T.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004).

At bottom, this obligation is an obligation to provide an adequate and appropriate education. The IDEA does not place school systems under a compulsion to afford a disabled child an ideal or an optimal education. See Lenn, 998 F.2d at 1086.

If a school system is unable to furnish a disabled child with a FAPE through a public school placement, it may be obliged to subsidize the child in a private program. See Burlington Sch. Comm. v. Mass. Dep't of Educ., 471 U.S. 359, 370 (1985). In such circumstances, the school system will be responsible for the reasonable costs incident to that private placement. See id. at 369; Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 31 (1st Cir. 2006).

It is common ground that the IDEA manifests a preference for mainstreaming disabled children. See, e.g., Rowley, 458 U.S. at 202; Roland M., 910 F.2d at 987. This entails ensuring, "[t]o the maximum extent appropriate," that disabled children are taught with nondisabled children. 20 U.S.C. § 1412(a)(5)(A). The goal, then, is to find the least restrictive educational environment that will accommodate the child's legitimate needs. See id.; see also Honig v. Doe, 484 U.S. 305, 321 (1988); Kathleen H. v. Mass. Dep't of Educ., 154 F.3d 8, 11 (1st Cir. 1998).

-9-

The method of the IDEA is straightforward. Under it, school systems must take steps to identify children who may qualify as disabled, evaluate each such child to determine his or her eligibility for statutory benefits, and develop a customized IEP designed to ensure that the child receives a level of educational benefits commensurate with a FAPE. 20 U.S.C. §§ 1412(a)(3)-(4), 1414(a)-(b). The IEP must include information about the child's disabilities, a statement of educational goals, a description of the measures that will be used to determine whether the child has met those goals, and a compendium of special education and related services that will be furnished to the child. See id. § 1414(d)(1)(A); see also Roland M., 910 F.2d at 987 (describing IEP requirements under the precursor to the IDEA). Those related services typically will consist of individualized services tailored to address the child's particular needs. See 20 U.S.C. § 1414(d)(1)(A); see also Burlington Sch. Comm., 471 U.S. at 368.

The development of an IEP is meant to be a collaborative project. A team must be identified for that purpose. It should include the parents, teachers representing various parts of the educational spectrum (that is, teachers with training in both regular and special education), officials of the school system, and sometimes others with expertise in the nature of the disability or the provision of particular services. See 20 U.S.C. § 1414(d)(1)(B).

If no consensus emerges from these collective endeavors, the parents may challenge either the school system's handling of the IEP process or the IEP itself. The first step in this adversarial pavane is a due process hearing. See id. § 1415(f). Either party may then seek judicial review of the hearing officer's decision by prosecuting an appeal to a state or federal court. Id. § 1415(i)(2)(A).

To determine whether an IEP provides the requisite educational benefit in a given case, some courts will in some circumstances consider only the final version of the IEP that the school system offered during the IEP process. See, e.g., County Sch. Bd. of Henrico v. Z.P., 399 F.3d 298, 306 n.5 (4th Cir. 2005); Knable v. Bexley City Sch. Dist., 238 F.3d 755, 768 (6th Cir. 2001). The thinking behind this so-called "four corners" rule is that when the IEP process has run its course and the school system has made its last, best offer of an IEP, a reviewing court faced with a substantive challenge will have a clear record of what placements and educational services were offered. See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1526 (9th Cir. 1994); see also A.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 682 (4th Cir. 2007). This circuit has yet to decide whether or not to adopt the four corners rule and, as we explain below, we have no occasion to consider the advisability of that course today.

If there is no last, best offer — that is, if the parents have initiated the adversary process in advance of the development of a final IEP — it makes very little sense to consider only the latest version of the IEP. This is especially true where the school system has acted expeditiously and the development of a final IEP has been frustrated by the parents' refusal to cooperate fully in the collaborative process. See Loren F. v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1312 (11th Cir. 2003); MM v. Sch. Dist. of Greenville Cty., 303 F.3d 523, 535 (4th Cir. 2002). In such circumstances, it would be wrong to put blinders on a reviewing court and restrict its inquiry to the partially completed IEP. Cf. Roland M., 910 F.2d at 995 (warning that courts ought not to allow parents to prevail when the inadequacy of an IEP was "created by their own obstructionism").

When this sort of scenario arises, the court should proceed to consider issues such as the way in which the IEP process unfolded and the relative responsibility of the participants for the breakdown of the process. In exploring such issues, the court is entitled to look at the totality of the circumstances, consider extrinsic evidence if necessary, and judge the parents' claims accordingly.

### B. __Incompleteness of the IEP__.

In this case, the district court determined that the October 18 IEP was not "final" because the parents had disrupted

-12-

the IEP process midstream. Five Town, 2007 WL 494994, at *33. Having made that finding, the court proceeded to consider information outside the IEP to assure itself that the School District's partially formulated position was consistent with its responsibilities to A.S. under the IDEA. See id. It concluded that, had the parents continued to cooperate and allowed the School District to fill in the gaps, the result would have been a satisfactory IEP that provided A.S. with a FAPE. See id. at *34.

The parents' primary challenge to this conclusion contests the finding that the IEP was incomplete. In that regard, they point out that the School District's special education director, Cindy Foreman, stated during the October 20 PET meeting that the October 18 IEP was "final." Based largely on that utterance, the parents assert that the district court's inquiry should have been restricted as a matter of law to the four corners of the October 18 IEP. The School District rejoins that Foreman's comment cannot be taken literally, that the October 18 IEP was obviously incomplete, and that the district court acted appropriately in looking beyond the four corners of that document. The parents cannot be heard to complain about the incompleteness of the IEP, the School District adds, because their refusal to cooperate in the IEP process obstructed the development of a full-fledged IEP.

The district court, like the hearing officer, resolved this contretemps in favor of the School District. As a matter of fact, we discern no clear error in that ruling: on its face, the October 18 IEP was manifestly incomplete. While it contained the main components of an individualized plan, it was missing several subsidiary components (such as the behavioral support and crisis management plans). On this record, the district court's finding that the IEP was incomplete was virtually inevitable.

Foreman's comment that the IEP was "final" does not require a different result. Taken in context, that remark does not seem to mean what the parents suggest. Conversation is not trigonometry, and in informal settings spoken language is rarely used in mathematically precise ways. In that connection, we have acknowledged that "words are like chameleons; they frequently have different shades of meaning depending upon the circumstances." United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004).

Here, the record considered as a whole plainly indicates that while the main components of the IEP (including the School District's decision to accommodate A.S.'s needs in a non-residential setting) may have been final in mid-October, the IEP most assuredly was not. Given the obvious gaps in the IEP, it would have been absurd for the district court to have treated Foreman's awkward locution as sufficient to transmogrify a

-14-

partially completed IEP into a fully completed one.[3]  Therefore, even in those jurisdictions that have adopted the four corners rule, the rule would not apply.

## C.  **Obstructive Conduct**.

The district court also found, as had the hearing officer, that the parents' precipitous actions had prevented the consummation of the IEP.  See Five Town, 2006 WL 494994, at *33. The court found that the parents harbored a fixed purpose: to effect a residential placement for their daughter at the School District's expense, come what may.  See id. at *18, *33.  Once the parents realized that the School District was focused on a non-residential placement, they essentially lost interest in the IEP process.  See id.  That finding, which was not clearly erroneous,[4] supported an inference of parental obstruction.  See MM, 303 F.3d at 535.  In turn, the finding of obstructionism, coupled with the finding of incompleteness, underbraced the court's decision to consider extrinsic evidence.

---

[3]The parents note that the October 12 meeting minutes suggest at one point that a "completed" IEP would be sent to the parents. Their reliance on this aspirational phrase suffers from the same shortcomings as their reliance on Foreman's infelicitous use of the word "final."

[4]To be sure, the parents presented evidence that they made a good-faith effort to visit the Zenith program prior to the last PET meeting.  But under the applicable standard of review, the district court was entitled to choose among conflicting inferences suggested by the evidence.  See Lenn, 998 F.2d at 1087.

-15-

Viewed in context, that decision makes perfect sense: while considering extrinsic information in the adequacy calculus may not be appropriate in the mine-run of cases, that course is peculiarly appropriate where, as here, the record reveals with conspicuous clarity that all the participants in the October 12 PET meeting wanted Dr. Miller's input in order to develop a proper crisis plan and positive behavior support plan for A.S. as part and parcel of a final IEP. Neither plan had been formulated when the School District transmitted the October 18 IEP to the parents. The parents cannot ignore these facts, nor expect a reviewing court to blind itself to them. Cf. Doe v. Defendant I, 898 F.2d 1186, 1190 (6th Cir. 1990) (approving consideration of extrinsic information when parents, as part of the team, "had all of the information required," even though all the particulars were "not contained within the four corners of the IEP").

From this point forward, the court, like the hearing officer, considered whether a public school day placement was appropriate and what benefits a finalized IEP would have provided. See Five Town, 2007 WL 494994, at *34. It supportably concluded that a public school non-residential placement constituted the least restrictive environment. It also concluded that, had the parents allowed the process to run its course, the School District would have developed a sound behavioral support plan and formulated a menu of psychiatric services to be offered to A.S. (which were in

-16-

line with the goals limned in the proposed IEP).  Id. at *34-35. And, finally, it held that because the resultant IEP would have been adequate to afford A.S. a FAPE, the parents' claim failed. Id. at *35.

In the last analysis, we need not probe too deeply into the adequacy of the IEP.  Given the district court's comprehensive factual findings, we can decide this case on a less nuanced ground. We explain briefly.

Congress deliberately fashioned an interactive process for the development of IEPs.  In so doing, it expressly declared that if parents act unreasonably in the course of that process, they may be barred from reimbursement under the IDEA.  See 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (providing that "[t]he cost of reimbursement . . . may be reduced or denied . . . upon a judicial finding of unreasonableness with respect to actions taken by the parents").

Here, the School District argues persuasively that the parents' conduct was unreasonable and that this unreasonableness precludes relief.  Although the district court drew no conclusions with regard to this provision of the IDEA, we are free to affirm its decision on any alternative ground that is evident from the record.  See InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003); United States v. Flemmi, 225 F.3d 78, 91 (1st Cir. 2000). Moreover, where the evidence supports a district court's findings

of fact, we may realign those findings under a different legal matrix and decide the case on that basis. See, e.g., Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 7 (1st Cir. 2007) (explaining that "[a] trial court's findings of fact, made in connection with one legal theory, may often be treated as fungible in connection with another [legal theory]"); Ferrara v. United States, 456 F.3d 278, 281 (1st Cir. 2006) (relying on district court's subsidiary findings of fact to decide appeal under a different articulation of the applicable rule of law); see also Societé des Produits Nestle v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir. 1992).

This is such a case. The district court supportably found that the parents' actions disrupted the IEP process, stalling its consummation and preventing the development of a final IEP. Moreover, the court found, the parents did so despite their knowledge that the School District planned to complete the unfinished portions with the parents' help. Tellingly, the court determined that the cause of the disruption was the parents' single-minded refusal to consider any placement other than a residential one. Five Town, 2007 WL 494994, at *33. Such Boulwarism, whether or not well-intentioned, constitutes an unreasonable approach to the collaborative process envisioned by the IDEA. See Roland M., 910 F.2d at 995. Here, that attitude sufficed to undermine the process.

To sum up, the district court found that the October 18 IEP was incomplete and that the parents' unreasonable actions had frustrated the completion of the IEP process.[5] Given these warrantable findings of fact, section 1412(a)(10)(C)(iii)(III) provides a solid ground for resolving the case against the parents. Their unreasonable obstruction of an otherwise promising IEP process fully justifies a denial of reimbursement under the IDEA. See M.S. v. Mullica Tp. Bd. of Educ., 485 F. Supp. 2d 555, 568 (D.N.J. 2007) (denying reimbursement because parents failed to cooperate in completion of IEP).

## D. **Substantive Adequacy**.

The parents' challenge to the lower court's decision has a further dimension. They assert that the IEP process, whether or not still ongoing, had effectively reached a dead end: in their view, the partially completed IEP includes so many wrong choices that a finding of inadequacy would have been inevitable (and so, completing the IEP process would have been an exercise in futility). The force of this assertion hinges on the parents' insistence that the School District arbitrarily ruled out a

---

[5] The parents' argument that the School District engaged in a "bait and switch" tactic by calling the IEP "final" and then backtracking at the due process hearing, Appellants' Reply Br. at 6, is meritless. As we have said, there is substantial evidence in the record that the School District expressed the need for further development of the IEP prior to the time of the parents' unilateral decision to relocate A.S. to a private residential placement.

residential placement even though such a placement was the only feasible way to provide A.S. with a FAPE.

This insistence flies in the teeth of the School District's evidence and the independent evaluator's recommendations. After canvassing the record, we conclude that the need for a residential placement was fairly debatable. Crediting the independent evaluator's views and the School District's testimony, the district court — like the hearing officer — found that the least restrictive educational environment would have been in a public non-residential placement. Five Town, 2007 WL 494994, at *35. Given the truism that courts should recognize the expertise of educators with respect to the efficacy of educational programs, Rowley, 458 U.S. at 207-08, we see no clear error in this finding (and, thus, no basis for setting aside the district court's decision).

The parents' remaining arguments on this issue need not occupy us for long. The few themes that they spin either mischaracterize the IEP's provisions or seek to have us undertake a de novo balancing of the facts. We are not swayed by the former, nor are we permitted to indulge the latter.

In all events, the best that can be said for the parents' position is that the evidence may support competing viewpoints. That circumstance dooms their challenge: we are not at liberty to reject the district court's plausible interpretation of the facts

simply because the record also might sustain a conflicting interpretation.  See Anderson v. Bessemer City, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Nor may we reject an adequate public school placement for an optimal private placement.  See Rowley, 458 U.S. at 200; see also Lenn, 998 F.2d at 1086 (explaining that federal law requires school districts to provide a reasonable level of educational benefit to disabled children, not an optimal level).

### E.  Requests for Relief.

This essentially ends our inquiry.  Although reimbursement of parental expenses for private residential placements sometimes is available under the IDEA, such reimbursement is contingent upon a showing that the parents diligently pursued the provision of appropriate services from the public school system, yet the school system failed to provide those services; and that the private placement is a suitable alternative. See Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12 (1993); Burlington Sch. Comm., 471 U.S. at 370.  When the parents make a unilateral choice, they must bear the associated risk: if the conditions for reimbursement are not met, the financial burdens are theirs.  Burlington Sch. Comm., 471 U.S. at 373-74; Roland M., 910 F.2d at 1000.

That is precisely what transpired here. The parents made a unilateral choice to abandon the collaborative IEP process without allowing that process to run its course. Thus, the parents are precluded from obtaining reimbursement for the costs of the Chamberlain School placement, see supra Part II(C), and a fortiori, they have not satisfied that prong of the reimbursement analysis.[6]

The parents' alternative claim for compensatory education is easily dispatched. Compensatory education is a surrogate for the warranted education that a disabled child may have missed during periods when his IEP was so inappropriate that he was effectively denied a FAPE. See Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R., 321 F.3d 9, 18 (1st Cir. 2003). However, compensatory education is not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA. See Pihl v. Mass. Dep't of Educ., 9 F.3d 184, 188 (1st Cir. 1993); see also G v. Ft. Bragg Dependent Schs., 343 F.3d 295, 309 (4th Cir. 2003) (stating that "[c]ompensatory education involves discretionary . . . relief crafted by a court" to correct a school district's failure under the Act).

As we have explained, the parents have failed to establish any violation by the School District of its duties under

---

[6]This result obtains whether or not the Chamberlain School offered a desirable placement for the child (a matter on which we take no view).

the IDEA.  Their claim for compensatory education cannot surmount this barrier.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we uphold the district court's judgment.


**Affirmed**.