# United States Court of Appeals

## For the First Circuit

No. 07-1860

MARK LESSARD AND LINDA LESSARD,

Plaintiffs, Appellants,

v.

WILTON-LYNDEBOROUGH COOPERATIVE SCHOOL DISTRICT AND
NEW HAMPSHIRE DEPARTMENT OF EDUCATION,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Lynch, Circuit Judge,
Selya and Siler,* Senior Circuit Judges.

Richard L. O'Meara, with whom Staci K. Converse, Nicole L.
Bradick, and Murray, Plumb & Murray were on brief, for appellants.
Jeanne M. Kincaid, with whom Melissa A. Hewey and Drummond
Woodsum & MacMahon were on brief, for appellees.

February 25, 2008

*Of the Sixth Circuit, sitting by designation.

**SELYA**, **Senior Circuit Judge**.  This appeal stems from parents' laudable efforts to provide the best possible education for their profoundly disabled daughter.  After disagreements arose over the contents of the child's proposed individualized education program (IEP), a state hearing officer overruled the parents' objections and concluded that the proposed IEP complied with the strictures of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491 (2000).[1]  A federal district court affirmed that decision.

On appeal, we hold that the defendants — the local school district and the state educational agency — fulfilled their responsibilities under the IDEA, that the delays complained of were attributable to the parents (and, thus, afford no grounds for relief), and that the IEP at issue here satisfied the applicable statutory imperatives.  Consequently, we affirm the judgment below.

## I.  BACKGROUND

At the heart of this litigation stands a young woman named Stephanie Lessard, who was eighteen years of age at the time of the relevant events.  We rehearse the facts pertaining to Stephanie's plight as supportably found by the district court.  See

_____

[1]The IDEA was amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647, but the relevant amendments did not take effect until July 1, 2005.  See id. § 302(a)(1).  Because that date is subsequent to the occurrence of the events at issue here, we refer throughout to the earlier version of the IDEA.

Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 2007 WL 1221103, at *1-4 (D.N.H. Apr. 23, 2007).

Stephanie Lessard has been diagnosed with moderate mental retardation (she possesses an IQ of 42), cognitive delays, speech impairments, a seizure disorder, scoliosis, a leg-length discrepancy, and partial paralysis of her left side. Since 2001, she has been a day student at Crotched Mountain Rehabilitation Center, a New Hampshire facility providing special needs services to the Wilton-Lyndeborough Cooperative School District (the School District).

In April of 2004, Stephanie's mother, Linda Lessard, met with representatives of the School District to map out Stephanie's IEP for the coming school year (2004-2005). Between that inaugural meeting and December of the same year, Mrs. Lessard and the IEP team huddled on at least four occasions to discuss the IEP, but progress was slow. In the interim, the School District continued to implement Stephanie's 2003-2004 IEP.

Of particular pertinence for present purposes is the meeting that took place on August 16, 2004. On her own initiative, Mrs. Lessard brought a psycholinguist (Dr. Kemper) to the meeting. He explained to the assemblage why the Lindamood-Bell Phoneme Processing System (LiPS) was in his view the most effective way to teach literacy to a child with learning disabilities as pronounced as Stephanie's. The IEP team declined to adopt that view, noting

-3-

that none of those assembled was schooled in that particular pedagogical methodology. The team nonetheless agreed to look into the matter.

At the same meeting, the School District gave Mrs. Lessard a proposed IEP for the upcoming school year and requested that she sign it. The IEP did not contain a component specifically addressing the correction of Stephanie's behavioral problems; that component was under ongoing review by personnel at Crotched Mountain. Curiously, a one-page "transition plan" (the last page of the IEP) ended abruptly in mid-sentence.

Lessard refused to sign the proffered IEP.[2] After the meeting, the School District sent her a letter requesting that she make clear what portions of the IEP engendered dissatisfaction. The School District also offered to schedule additional meetings to discuss and perhaps reshape the IEP. The Lessards kept their own counsel and did not communicate their specific objections to the IEP.

Another meeting took place in October. It soon became apparent that a schism existed: whereas the School District envisioned the task at hand to be putting the finishing touches on the proffered IEP, Mrs. Lessard envisioned the IEP process as in

---

[2]This was not the first time that Stephanie's parents had balked at signing a newly tendered IEP. Stephanie's 2002-2003 IEP was not signed until June of 2003, and her 2003-2004 IEP was not signed until January of 2004.

its infancy. Yet, despite her evident displeasure, Mrs. Lessard again declined to chronicle any specific criticisms of the IEP as it stood. After the October meeting, the School District again requested by letter that Mrs. Lessard delineate in writing her objections to the proffered IEP. No such delineation ensued.

Persistent scheduling conflicts prevented the protagonists from reconvening until December 2. At that time, the School District presented a new version of the IEP, which contained both the now-vetted behavioral plan as well as a full-blown transition plan (that is, a plan designed to transition the disabled child into independent, adult life). Mrs. Lessard refused to sign the December IEP, complaining that the team had yet to "develop[]" the IEP. This reaction prompted the School District to invoke its right to a due process hearing, see N.H. Code Admin. R. Ann. Ed. 1125.05(c) (2007), as a means of determining the suitability of the recently submitted IEP.

That hearing took place over two days, during which eight members of the IEP team testified on behalf of the School District. In rebuttal, the parents introduced the expert testimony of a reading specialist and a physical therapist; another literacy expert (Dr. Kemper) testified solely through the medium of written findings. In a decision dated March 22, 2005, the state hearing officer ruled that the December IEP suffered from neither procedural nor substantive faults. He therefore ordered it placed

into effect and denied the parents' cross-petition for compensatory education and other relief.

The Lessards rejoined by filing an action in the United States District Court for the District of New Hampshire. See 20 U.S.C. § 1415(i)(2). Their suit raised the same procedural and substantive objections that had been advanced in the due process hearing and sought compensatory education for the alleged deprivation of the free appropriate public education (FAPE) owed to Stephanie Lessard under the IDEA. The suit added a claim that the administrative hearing, as conducted, violated the Lessards' procedural due process rights.

In the court case, Mrs. Lessard — who had declined to testify before the state hearing officer — took the witness stand; otherwise, the evidence before the district court largely replicated the evidence in the administrative record. The district court found no fault with the conduct of the administrative hearing, upheld the hearing officer's findings and conclusions, and denied the Lessards' requests for relief. See Lessard, 2007 WL 1221103, at *11.

The Lessards, qua appellants, prosecuted this timely appeal. Before us, they do not challenge the district court's resolution of their procedural due process claim. They do, however, press the other objections that were raised below.

## II.  THE STATUTORY SCHEME

The IDEA declares that, as a condition for receiving federal funds, states must provide all disabled children with a FAPE.  See 20 U.S.C. §§ 1401(8), 1412(a)(1)(A).  The primary vehicle for delivery of a FAPE is the child's IEP.  The IEP must include, at a bare minimum, the child's present level of educational attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress toward those goals, and the specific services to be offered.  See id. § 1414(d)(1)(A); Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993).

An IEP is subject to both procedural and substantive requirements.  Those requirements can flow from either federal or state law (at least to the extent that the latter is not incompatible with the former).  See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 987 (1st Cir. 1990).

As an example of a federally-imposed procedural requirement, the IDEA specifically confers upon parents a right to be part of the "IEP team," that is, the group of individuals charged with formulating a particular child's IEP and which comprises educational professionals who either possess specialized knowledge about or will be involved in the child's education.  See 20 U.S.C. § 1414(d)(1)(B).  An example of a state-imposed procedural requirement is the New Hampshire regulation stipulating

that parents must annually consent to and sign their child's IEP. See N.H. Code Admin. R. Ann. Ed. 1125.04(a)(3) (2007); cf. 20 U.S.C. § 1415(b)(3) (imposing the lesser requirement that the school district give notice to the parents of proposed changes to an extant IEP). Federal and state law converge in demanding that an IEP be in effect by the commencement of the school year. See 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.342(a) (2000); N.H. Code Admin. R. Ann. Ed. 1109.08(c) (2007).

There is no mechanical checklist by which an inquiring court can determine the proper content of an IEP; "IEPs are by their very nature idiosyncratic." Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R., 321 F.3d 9, 20 (1st Cir. 2003). One thing is clear: the substance of an IEP must be something different than the normal school curriculum and something more than a generic, one-size-fits-all program for children with special needs. In the Supreme Court's phrase, an IEP must be "individually designed to provide educational benefit to [a particular] handicapped child." Hendrick Hudson Bd. of Educ. v. Rowley, 458 U.S. 176, 201 (1982).

It is worth emphasizing that the obligation to devise a custom-tailored IEP does not imply that a disabled child is entitled to the maximum educational benefit possible. See id. at 206-08; C.G. v. Five Town Cmty. Sch. Dist., ___ F.3d ___, ___ (1st Cir. 2008) [No. 07-1708, slip op. at 9]; Lt. T.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004). An IEP need only supply

-8-

"some educational benefit," not an optimal or an ideal level of educational benefit, in order to survive judicial scrutiny. Mr. & Mrs. R., 321 F.3d at 11; see Roland M., 910 F.2d at 992.

Serial review mechanisms present the means for enforcing these procedural and substantive rights. By statute, parents may file a complaint with the state educational agency, which must convene a hearing (sometimes called a "due process hearing") to pass upon the adequacy of a proposed IEP. 20 U.S.C. § 1415(f). Under New Hampshire law, the School District also may pursue a due process hearing to test the validity of a proposed IEP. See N.H. Code Admin. R. Ann. Ed. 1125.05(c) (2007). Either side may then appeal from the hearing officer's final decision to either a federal or state court of competent jurisdiction. 20 U.S.C. § 1415(i)(2)(A).

## III. THE STANDARD OF REVIEW

In reviewing the hearing officer's decision, the district court is tasked with determining the IEP's appropriateness on the basis of the preponderance of the evidence. See id. § 1415(i)(2)(B). Judges are not trained pedagogues, and they must accord deference to the state agency's application of its specialized knowledge. See Renner v. Bd. of Educ. of Pub. Schs. of Ann Arbor, 185 F.3d 635, 641 (6th Cir. 1999) (remarking that "federal courts are generalists with no expertise in the educational needs of handicapped children") (citation and internal

-9-

quotation marks omitted); see also González v. P.R. Dep't of Educ., 254 F.3d 350, 352 (1st Cir. 2001) (noting that a district court, faced with conflicting expert testimony anent educational placement, may justifiably feel "bound to affirm" the state agency's determination). As a result, judicial review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard. See Roland M., 910 F.2d at 989; see also Nack v. Orange City Sch. Dist., 454 F.3d 604, 609 (6th Cir. 2006) (observing that district court may give some deference to the fact findings of the hearing officer, especially when educational expertise is essential to the findings).

In this case, the district court appropriately engaged in a bounded, independent review of the state hearing officer's decision, see, e.g., Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 53 (1st Cir. 1992), giving due deference to the hearing officer's determinations. Because the court's findings and conclusions are consistent with those of the hearing officer, we for the most part abjure separate reference to the hearing officer's decision and focus on the decision of the district court.

With respect to that decision, we grant its factual findings the deference implicit in clear-error review, see González, 254 F.3d at 352, while evaluating its answers to abstract questions of law de novo, see Five Town, ___ F.3d at ___ [slip op. at 7]. Determinations as to an IEP's appropriateness and adequacy

present mixed questions of law and fact. These questions are handled on a degree-of-deference continuum, and the exact standard of review depends on whether and to what extent a particular determination is law- or fact-dominated. See id. at ___ [slip op. at 8]; Mr. I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 10 (1st Cir. 2007). Absent an error of law, we will reverse only if the district court's determination, when seen in light of the record as a whole, is clearly erroneous. See Lt. T.B., 361 F.3d at 84; Roland M., 910 F.2d at 990-91.

## IV.  ANALYSIS

The appellants raise both procedural and substantive objections to the decision below. Their procedural objection rests on an allegation that the district court improperly excused the School District's delay in proffering a completed IEP. Their substantive objection has twin foci: first, they assert that the district court used an incorrect standard in evaluating the IEP; second, they assert that the final version of the IEP failed to provide for adequate literacy, transition, and behavioral services. We address these objections sequentially.

### A.  **The Procedural Objection**.

The appellants claim that the August IEP was incomplete and that the December IEP was so tardy as to constitute a per se denial of Stephanie's right to a FAPE. In mounting this argument, they emphasize the IDEA's requirement that "[a]t the beginning of

-11-

each school year, each local educational agency . . . shall have in effect, for each child with a disability in its jurisdiction, an individualized education program."  20 U.S.C. § 1414(d)(2)(A).

This assault depends entirely on the alleged incompleteness of the August IEP.  That allegation is grounded on two perceived shortcomings in that document: the truncated transition plan and the absence of a behavioral plan.  The appellants contend that these shortcomings eloquently attest that the August IEP offered Stephanie only a fraction of what she was entitled to receive.

This contention substantially misconceives what the IDEA requires.  The transition plan contained in the August IEP consists solely of background information and performance goals, and suddenly ends mid-sentence.  That is hardly a full-fledged transition plan.  The rub, however, is that the IDEA does not require a stand-alone transition plan as part of an IEP.

Sections 1414(d)(1)(A)(vii)(I) and (II), reproduced in the margin,[3] require that IEPs contain statements of transition

---

[3]That statute provides in pertinent part that an IEP must include:
> (I) beginning at age 14, and updated annually, a statement of the transition service needs of the child under the applicable components of the child's IEP that focuses on the child's courses of study (such as participation in advanced-placement courses or a vocational education program); [and] (II) beginning at age 16 (or younger, if determined appropriate by the IEP Team), a statement of needed transition services for the child, including, when appropriate, a statement of the

services.  But neither section requires that those statements be articulated in a separate component of the IEP.  In fact, section 1414(d)(1)(A)(vii)(I) specifically contemplates the inclusion of statements of transition services "under the applicable components of the child's IEP."  Thus, merely pointing to the absence of a stand-alone transition plan cannot form the basis for a founded claim of procedural error.

To be sure, the statutory provisions quoted in the margin implicitly acknowledge that transition services must be provided to disabled children who need them, in accordance with the Rowley standard.  See, e.g., Browell v. Lemahieu, 127 F. Supp. 2d 1117, 1126 (D. Haw. 2000).  Here, however, the appellants have made no claim that the August IEP lacks sufficient transition services (which, in fact, are integrated throughout the IEP's various components).  We thus reject the "transition plan" claim of error.

An even more egregious misunderstanding of the IDEA's requirements undermines the claim of procedural error based on a missing behavioral plan.  The IDEA only requires a behavioral plan when certain disciplinary actions are taken against a disabled child.  See 20 U.S.C. §§ 1415(k)(1)(A) & (B)(I); see also Alex R. v. Forrestville Valley Sch. Dist., 375 F.3d 603, 614 (7th Cir.

interagency responsibilities or any needed linkages; . . . 20 U.S.C. § 1414(d)(1)(A)(vii).

2004). The appellants make no claim that the necessary disciplinary predicate had transpired in this instance.

The other statutory provision cited by the appellants — 20 U.S.C. § 1414(d)(3)(B)(I) — also falls short of requiring a behavioral plan as an ubiquitous feature in every IEP. That statute, in terms, directs IEP teams to "consider, when appropriate," formulating such plans. The record is pellucid that, by the time the August IEP was prepared, the IEP team already had considered and formulated a behavioral plan but had opted not to include it in the IEP pending Crotched Mountain's approval.

In a last-ditch effort to turn the tide, the appellants call our attention to a federal regulation, 34 C.F.R. § 300.346(c) (2000), which states: "If . . . the IEP team determines that a child needs a particular device or service (including an intervention, accommodation, or other program modification) in order for the child to receive FAPE, the IEP team must include a statement to that effect in the child's IEP." Although such a regulation is entitled to judicial deference, see Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 161 (1st Cir. 2004), this regulation did not require the August IEP to encompass a behavioral plan, merely to consider formulating one. Here, the IEP team mulled the matter and determined that a behavioral plan was not necessary in order to afford Stephanie a FAPE. No more was exigible.

-14-

That effectively ends this aspect of the matter. We conclude, without serious question, that the district court did not err in finding that the absence of either a transition or behavioral plan did not constitute a procedural defect within the meaning of the IDEA.

Once it is determined that the August IEP was complete, the appellants' argument quickly unravels. All that remains is the lack of a signed IEP at the start of the school year. But even in a regime in which parental assent is required before an IEP can become effective, it cannot be that a school system transgresses the IDEA whenever a parent — for whatever reason — refuses to sign a completed IEP before the school year commences. Otherwise, school systems would be at the mercy of obdurate parents — a result plainly at odds with the collaborative relationship fostered by the IDEA framework. See, e.g., Five Town, ___ F.3d at ___ [slip op. at 10] ("The development of an IEP is meant to be a collaborative project."); MM v. Sch. Dist. of Greenville County, 303 F.3d 523, 535 (4th Cir. 2002) (explaining that "it would be improper to hold [a] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation") (citation and internal quotation marks omitted). Consequently, a parent's obstruction of the IEP process, caused by his or her unreasonable delay in acting upon a completed IEP, can relieve a school system

from its obligation to have an assented-to IEP in place at the start of the school year. See Doe v. Defendant I, 898 F.2d 1186, 1189 (6th Cir. 1990); see also Roland M., 910 F.2d at 995 ("The law ought not to abet parties who block assembly of the required team and then, dissatisfied with the ensuing IEP, attempt to jettison it because of problems created by their own obstructionism.").

The case at bar presents a paradigmatic example of a situation in which a delay in having a signed IEP in place is fairly laid at the parents' doorstep. On August 16, the School District presented Stephanie's mother with a completed IEP that covered every essential component. From that point forward, the record discloses a consistent pattern in which the School District would strive to identify the parents' specific concerns and the parents would refuse to say more than that they wanted further meetings. The School District made numerous attempts to arrange such meetings and succeeded in holding two extended sessions with Stephanie's mother. These meetings proved fruitless: the most that could be gleaned from Mrs. Lessard was her opinion that the proffered IEP was, for some unexplained reason, still "in the developing stage."

Given this mise-en-scène, we can discern no clear error in the district court's conclusion that whatever delays plagued the signing of Stephanie's 2004-2005 IEP were the product of her

mother's own intransigence.[4]  See Lessard, 2007 WL 1221103, at *7.
Those delays, in turn, justified the court in exonerating the
School District with respect to the IEP's late implementation.  The
interactive process constructed by Congress was not intended to
deal a trump card to parents bent on prolonging IEP negotiations
indefinitely.  See MM, 303 F.3d at 535.

The appellants object to this finding, citing our
remonstrances in Mr. & Mrs. R..  There, we cautioned that "[i]n
mounting a challenge to a current or proposed IEP, the most that
parents can be expected to do is to point out areas in which the
IEP is deficient."  321 F.3d at 20.  The appellants suggest that,
under this precept, they cannot be faulted for having failed to
respond to the School District's requests for insight.  This
suggestion is baseless.

Line-drawing is often difficult, and in the IEP context
it is impossible to draw a precise line separating healthy requests
for parental input from impermissible demands that parents do the
school system's work.  Here the record leaves no doubt as to where
along that continuum the present case falls.  When the School
District contacted Stephanie's mother following her rejection of

[4]We emphasize that the August IEP was complete, and there is
no evidence that the appellants' refusal to sign it interfered with
Stephanie's receipt of a FAPE (at bottom, they argued only that the
absence of a signature constituted a per se violation of the IDEA's
requirements).  Indeed, during the appellants' negotiations with
the other members of the IEP team, the 2003-2004 IEP continued to
be fully implemented.

the August IEP, it asked her to "state specifically what you agree or disagree with." Such an entreaty, which the School District essentially repeated in letters of inquiry sent to her on August 25, October 24, November 16, and November 30, respectively, strikes us as the functional equivalent of a request to point out deficiencies in an IEP.

## B. **The Substantive Objections**.

We turn next to the appellants' substantive objections, which are addressed to the December IEP. We subdivide this discussion into four segments to match the appellants' asseverational array.

1. **Incorrect Legal Standard**. The appellants insist that the lower court erred by applying an incorrect legal standard. Specifically, they argue that, in the area of transition services, the Rowley standard has been supplanted by the 1997 amendments to the IDEA, see IDEA Amendments for 1997, Pub. L. No. 105-17, 111 Stat. 37, but the court failed to recognize this development.

To put this argument into perspective, we start with the Rowley Court's mandate that IEP components must be "reasonably calculated to enable the child to receive educational benefits." 458 U.S. at 207. The appellants contend that Congress, in 1997, raised the bar for IEP transition services, directing that those services must result in actual and substantial progress toward integrating disabled children into society.

-18-

Existing precedent forecloses this contention.  In Lt. T.B., the parents advanced a similar though slightly more ambitious thesis; they posited that, given Congress's statement of goals, the 1997 amendments must have replaced the Rowley standard across the board with a requirement that an IEP furnish a disabled child with the "maximum benefit" available.  361 F.3d at 83.  We flatly rejected that thesis, noting that it had no support in the text of the amendments and that no other court of appeals, post-1997, had exhibited a willingness to scuttle the Rowley standard.  Id.  For aught that appears, the decision in Lt. T.B. remains good law.[5]

To the interpretive mix presented in Lt. T.B., the appellants add only an allusion to the amendments' definition of "transition services."  In relevant part, the amendments defined that term to mean "a coordinated set of activities for a student with a disability that is designed within an outcome-oriented process, which promotes movement from school to post-school activities."  20 U.S.C. § 1401(30)(A).  The appellants theorize that an "outcome-oriented process" must mean a process that actually achieves substantial progress toward that outcome and,

_____

[5]In arguing for a contrary result the appellants rely on two cases.  Neither decision is persuasive.  The first is an unpublished district court decision, J.L. v. Mercer Island Sch. Dist., 2006 WL 3628033 (W.D. Wash. Dec. 8, 2006).  The reasoning of that decision is unconvincing and we decline to follow it.  The second, Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 861-64 (6th Cir. 2004), purports to construe the original Rowley standard.  The opinion is, therefore, inapposite.

thus, the 1997 amendments must to this extent have superseded the Rowley standard.

The appellants read far too much into Congress's 1997 definition of transition services. It seems obvious to us that the word "process" denotes a praxis or procedure; it does not imply a substantive standard or a particular measure of progress. The adjectival phrase "outcome-oriented" is similarly agnostic with respect to ultimate results; it specifies the perspective that participants in the process should strive to attain but does not establish a standard for evaluating the fruits of that process.

For these reasons, we decline the appellants' invitation to defenestrate the Rowley standard. The district court did not apply an incorrect legal rule in evaluating the adequacy of the transition services limned in Stephanie's final IEP.

**2.** **Literacy**. The appellants' next claim relates to Stephanie's proposed reading program. In their view, the School District's literacy methodology produced a level of progress categorically beneath what their daughter was capable of attaining. Since superior methodologies were readily available (in particular the LiPS system advocated by Dr. Kemper), the School District's chosen methodology denied Stephanie a FAPE.

It is difficult to prevail on a claim of this nature. The Supreme Court has pointed out with conspicuous clarity that the IDEA confers primary responsibility upon state and local

educational agencies to choose among competing pedagogical methodologies and to select the method most suitable to a particular child's needs. Rowley, 458 U.S. at 207. Then-Justice Rehnquist, writing for the majority, added that "it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to [the IDEA]." Id. at 207-08. After all, courts lack the "specialized knowledge and experience" needed to resolve "persistent and difficult questions of educational policy." Id. at 208 (citation and internal quotation marks omitted). Thus, "once a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States." Id.

Rowley sends a very clear message. The short of it is that courts are entrusted with ascertaining the adequacy of an IEP's educational components but not with weighing the comparative merit of the components when stacked against other heuristic methods. See, e.g., Lt. T.B., 361 F.3d at 86; G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 948 (1st Cir. 1991).

In an effort to expand the scope of judicial intervention, the appellants resort to an esoteric definition of "appropriate educational theories," which they equate with theories that produce results. They do not contest that the IEP favored a standard, multisensory reading methodology. Nevertheless, they

argue that since Dr. Kemper concluded that Stephanie had progressed very little under that methodology, it was, a fortiori, "inappropriate."

This construct inverts the rule of decision. Actual educational progress can (and sometimes will) demonstrate that an IEP provides a FAPE. See, e.g., Rowley, 458 U.S. at 209-10; Nack, 454 F.3d at 612; see also Roland M., 910 F.2d at 991 (explaining that "actual educational results are relevant to determining the efficacy of educators' policy choices"). But to impose the inverse of this rule — that a lack of progress necessarily betokens an IEP's inadequacy — would contradict the fundamental concept that "[a]n IEP is a snapshot, not a retrospective." Roland M., 910 F.2d at 992. Where, as here, a school system develops an IEP component in reliance upon a widely-accepted methodology, an inquiring court ought not to condemn that methodology ex post merely because the disabled child's progress does not meet the parents' or the educators' expectations. See Lachman v. Ill. St. Bd. of Educ., 852 F.2d 290, 297 (7th Cir. 1988).

If more were needed — and we doubt that it is — we remark the district court's finding that Stephanie had been making reasonable progress in reading. See Lessard, 2007 WL 1221103, at *8. That finding is fully supportable: in his testimony at the due process hearing, Stephanie's reading teacher painted a far more positive picture than did Dr. Kemper, testifying that Stephanie had

-22-

been making steady headway. The hearing officer and the district court were entitled to accept that assessment. After all, levels of progress must be judged with respect to the potential of the particular child. Polk v. Cent. Susquehanna Intermed. Unit 16, 853 F.2d 171, 185 (3d Cir. 1988). So here: while the reported progress is modest by most standards, it is reasonable in the context of Stephanie's manifold disabilities and low IQ.

That disposes of the literacy-related claim. On this record, we are compelled to conclude that, in the subject area of reading, the proffered IEP afforded Stephanie educational benefits consistent with a FAPE.

**3.   Transition Services**.   The appellants voice dissatisfaction with the transition services component of the December IEP. They claim that this component was too generic and that a personalized IEP tailored to Stephanie's needs would necessarily have contained "relatively intense services in community-based settings to prepare her to be a contributing member of society." Appellants' Br. at 43. They acknowledge that the IEP provided for monthly field trips into the community, but aver that those trips were inadequate because behavior problems often prevented Stephanie from participating in them.

In our estimation, the district court did not clearly err in finding the panoply of transition services adequate. See Lessard, 2007 WL 1221103, at *9. In addition to the scheduled

field trips, the December IEP incorporated a wide array of other transition services. These included six hours of pre-vocational training each week and regular instruction in specific transition-related skills (such as using a telephone, identifying workers in community settings, maintaining proper self-hygiene, and preparing food). This regimen apparently had some efficacy; the district court found that Stephanie's transition skills were improving. See id.

In an effort to blunt the force of this reasoning, the appellants argue that a specific service — activities conducted in community settings — failed adequately to provide educational benefits in an important area of need. Though artfully framed, this argument fails for two reasons. First, in considering the adequacy of a myriad of transition services, an inquiring court must view those services in the aggregate and in light of the child's overall needs. See, e.g., Rettig v. Kent City Sch. Dist., 788 F.2d 328, 332 (7th Cir. 1986). The test is whether the IEP, taken in its entirety, is reasonably calculated to enable the particular child to garner educational benefits. See id.; Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist., 736 F.2d 873, 877 (2d Cir. 1984). Were the law otherwise, parents could endlessly parse IEPs into highly particularized components and circumvent the general rule that parents cannot unilaterally dictate the content

of their child's IEP.  See Rowley, 458 U.S. at 207-08; Lachman, 852 F.2d at 297.

The second reason why the appellants' argument founders is that the district court concluded that the extant community-oriented services, when evaluated in conjunction with the IEP's other transition services, furnished Stephanie with the requisite educational benefit.  Lessard, 2007 WL 1221103, at *9.  This finding is not clearly erroneous.  While we can accept the possibility that monthly field trips might not be an ideal service component given Stephanie's needs, the IDEA does not require an ideal or optimal IEP, simply an adequate one.  See Five Town, ___ F.3d at ___ [slip op. at 9]; Lenn, 998 F.2d at 1086.

4.  **Behavioral Plan**.  The appellants' last substantive objection focuses on the supposed inadequacy of the IEP's behavioral plan.  This objection fails for reasons already discussed: no behavioral plan is required for purposes of this IEP. See supra Part IV(A); see also Alex R., 375 F.3d at 614.

## V. CONCLUSION

Many judges are parents too, and we can admire the determination with which the appellants have pursued the best possible education for their profoundly disabled daughter.  That is as it should be.  See Rowley, 458 U.S. at 209 (predicting that parents "will not lack ardor in seeking to ensure that handicapped children receive all of the benefits to which they are entitled by

the Act"). But determination must be tempered by an understanding that school districts, like parents and children, have legal rights with respect to special education. In demanding more than the IDEA requires, the appellants frustrated the operation of a collaborative process and put the School District in an untenable position. Under the circumstances, the School District cannot be faulted either for the timing of the resultant IEP or for its substance.

We need go no further. For the reasons elucidated above, we affirm the district court's conclusion that the School District acted in conformity with its responsibilities under the IDEA. Consequently, we descry no basis for granting the appellants' prayer for compensatory education or other redress.

**Affirmed**.